Shapiro *v.* Shapiro, Appellant.

Argued May 6, 1964. Before Bell, C. J., Jones, Cohen, Eagen, O'Brien and Roberts, JJ.

reargument refused November 19, 1964.

*Michael H. Egnal,* with him *Eugene F. Brazil,* and *Egnal and Simons,* for appellant.

*David S. Malis,* with him *Malis, Malis & Malis,* for appellee.

OPINION BY MR. JUSTICE ROBERTS, September 29, 1964:

Bennard and Merton Shapiro, brothers, filed a complaint in equity against their parents, Samuel and Edna Shapiro, seeking to compel performance of certain written agreements. By these agreements, Samuel and Edna Shapiro bound themselves to sell to each of their sons ten shares of their stock in the Arcadia Theatre Company for $1,675 per share, at any time within three years from the date of the agreements.[1]

---

[1] The option agreements were the product of a tangled background.

The Arcadia Theatre Company, a corporation, owns the real estate on which the Arcadia Theatre is situated. However, prior to December, 1961, the theatre was operated, not by the corporation itself, but by a partnership which leased the premises. Samuel and Edna Shapiro were among the shareholders of the corporation, but were not members of the partnership. On the other hand, Bennard and Merton were members of the partnership, but held no stock in the corporation.

Late in 1957, cash withdrawals by Merton began to cause dissension in the partnership, and an attempted solution was formulated in December, 1958. One of the partners sold her interest and stepped out of the picture entirely. The partnership was dissolved and thereafter the corporation was to both own and operate the theatre. Merton and Bennard were to be given the opportunity to purchase stock in the corporation by means of the option agreements at issue in this case.

The option agreements acknowledged receipt of $1,000 from each of the sons, to be credited to the total purchase price.

Edna Shapiro, although a defendant of record, has at all times indicated her willingness to perform under the agreements.[2] Only Samuel Shapiro challenged his obligation to transfer the stock and he will be referred to as defendant. After commencement of the action, Merton Shapiro, having executed the pleadings under oath and given some testimony against his father, withdrew and allied himself with his father, Samuel. Bennard Shapiro will therefore be referred to as plaintiff.[3]

In his answer, defendant did not dispute execution of the agreements, but relied instead on two affirmative defenses. One of these alleged that defendant was not mentally competent at the time the agreements were executed. The other defense asserted that unfulfilled restrictions had been imposed orally on the delivery of the agreements.[4]

Following plaintiff's denial of this new matter, the cause was heard by a chancellor on the issues which the affirmative defenses formulated. In addition, the chancellor was to determine what amount, if any, had been paid toward the total purchase price of the stock.

The hearing extended over thirty-five days, Bennard and Merton offering in excess of two hundred exhibits and defendant in excess of fifty. As a result,

---

[2] The disputed stock is held by the entireties and Edna was therefore made a party to the action.

[3] The litigation was complicated by a variety of other bitter suits among and between the record parties in this equity action. The other suits involved litigation between husband and wife, father and son, brother and brother, and client and counsel.

[4] Defendant alleged that the agreements were to be held in escrow, not to become effective or delivered to his sons unless he died or failed to recover his usual physical and mental capacity within the three year option period.

the record before us consists of well over 3000 pages of testimony.

The chancellor made extensive findings of facts and conclusions of law sustaining plaintiff's right to specific performance. The court concluded that Bennard and Merton paid a total of $8,050 on account of the agreements. Numerous financial transactions relating to various enterprises, coupled with the fact that Merton maintained no separate checking account, made it impossible to determine exactly how much each brother had contributed. The chancellor attributed one half of the sum already paid to each of the brothers.

A decree nisi was entered directing Samuel and Edna to deliver ten shares of stock of Arcadia Theatre Company to plaintiff upon payment by him of $12,725. Exceptions were filed, argued and dismissed. The decree nisi was made absolute and this appeal followed.

Defendant-appellant raises two questions by this appeal. First, was plaintiff guilty of "unclean hands" because of allegedly improper action in preparing and proving his case? Secondly, did plaintiff fail to prove his case as made out by his pleadings?

The doctrine that those seeking equity must come with clean hands has become the subject of fairly well defined principles. The broad general maxim has been described by the Supreme Court of the United States in *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 814-15, 65 S. Ct. 993, 997 (1945) : "This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. . . . Thus while 'equity does not

demand that its suitors shall have led blameless lives'
. . . as to other matters, it does require that they shall
have acted fairly and without fraud or deceit as to the
controversy in issue. . . .

"This maxim necessarily gives wide range to the
equity court's use of discretion in refusing to aid the
unclean litigant."

Application of the unclean hands doctrine is con-
fined to willful misconduct which concerns the par-
ticular matter in litigation. It does not apply to col-
lateral matters not directly affecting the equitable re-
lations which exist between the parties. *McLaughlin
v. McLaughlin,* 410 Pa. 1, 5, 187 A. 2d 905, 907 (1963) ;
*Holst v. Butler,* 379 Pa. 124, 134, 108 A. 2d 740, 745
(1954) ; *Hartman v. Cohn,* 350 Pa. 41, 46, 38 A. 2d 22,
25 (1944) ; *Vercesi v. Petri,* 334 Pa. 385, 388, 5 A. 2d
563, 565 (1939). Moreover, in exercising his discre-
tion, the chancellor is free to refuse to apply the doc-
trine if a consideration of the entire record convinces
him that an inequitable result will be reached. *Hart-
man v. Cohn,* supra.

With these principles in mind, we examine the con-
tentions urged by appellant. The first of these is that
plaintiff manufactured evidence in order to show al-
leged payments on account of the option price. Dis-
agreements arose between the parties concerning the
exact amount which had been paid on the option agree-
ments. Before this suit began, counsel for all con-
cerned suggested that each compile a list showing what
each believed the correct amounts to be.

Merton and Bennard prepared a joint list wherein
they itemized check numbers, dates and amounts. Their
conclusion was that together they had paid $23,500
toward the contract purchase price. A second list pre-
pared solely for Bennard estimated his individual share
of the payments at $10,375. Similarly, defendant, in
his handwriting, prepared his estimate and he indicat-

ed uncertainty over several of the items listed. Later, these lists were offered at trial for the convenience of counsel, the parties and, hopefully, the chancellor. They were not evidence and were never received by the court as evidence. The chancellor, upon a careful analysis of the entire record, made his own independent determination of what amounts had been paid.[5] There is no indication whatever of willful falsification, and certainly defendant was not prejudiced by the court's receipt of these suggested aids in view of the court's conclusion that neither of the amounts estimated by Bennard and Merton were correct.

In the same vein, defendant urges that plaintiff fraudulently added a notation on a check dated September 22, 1960, for $1,600 after the check had cleared the bank and was returned to him. This was one of the checks which the chancellor accepted as being a payment under the agreements. On direct examination, plaintiff admitted that he had placed the notation "Paid to date—$18,000.00 A.T. Co. Stock" on the check after it was returned to him. Plaintiff had the problem of reconstructing his payments once he was aware a dispute was in the offing. That he did not

---

[5] The chancellor determined that two checks for $1,000 each had been paid to defendant on November 5, 1958, at or about the time discussions concerning the option agreements first took place in the family circle. Defendant's own handwritten list of payments included a reminder to ascertain whether $2,000 deposited on November 6, 1958, related to the option agreements. The chancellor decided that these were the two payments acknowledged in the agreements. Six other payments totalling $6,050, by checks specifically marked as being option payments, constituted the balance.

The chancellor was most cautious and allowed only those credits just enumerated. Although the record might have supported additional credits, a certain amount of conjecture would have been involved because of the difficulty in interpreting records which were not well kept and which involved transactions in many unrelated enterprises.

make the notation in the first instance was a matter to be considered by the chancellor in weighing plaintiff's credibility in the light of the total circumstances. Our examination of the record leads us to conclude, as did the chancellor, that the record fails to support the contention that plaintiff fraudulently reconstructed the payments.

In furtherance of his argument that plaintiff should be barred under the doctrine of unclean hands, defendant points to plaintiff's extraction of letters and documents from defendant's files. Plaintiff admitted this and contended he did so for the purpose of insuring available copies of the material. Some of this data related to the present litigation, while other parts pertained to support proceedings which plaintiff's mother, Edna, instituted against the defendant. These records were primarily material in this case as refutation of defendant's contention that he was not competent at the time the option agreements were executed. Plaintiff assisted the defendant in many of his enterprises and he had access to substantial portions of his father's files.

The chancellor was not convinced that the records were private. Nor did he condone plaintiff's method of securing the data, but he was satisfied that this conduct, in and of itself, was insufficient to bar recovery.[6] We agree with this conclusion. Although plaintiff's conduct was not entirely proper under the exist-

---

[6] In his opinion, the chancellor made reference to the large number of exhibits which plaintiff had introduced and noted that he "was impressed with the prodigious amount of work represented by this evidence, but was not impressed by the fact that a good part of this evidence came from the business files of Samuel Shapiro."

In discussing this point, the court en banc stated: "We neither criticize nor applaud his [plaintiff's] conduct. Our holding directly is that whatever was done was done in connection with other litigation and had no direct bearing upon this case."

ing circumstances, it was not of such a nature as would require us to hold that the chancellor abused his broad discretionary power in finding that plaintiff's conduct had no substantial bearing on the merits and on plaintiff's ultimate right of recovery. It appears likely that the records were not privileged and could have been obtained by ordinary judicial process. This would have been the safest course for plaintiff to have pursued. However, his action in following a less proper route does not, of itself, amount to such inequitable conduct as would bar recovery.

Defendant further urges that plaintiff fraudulently denied that defendant loaned him $1,500 by check dated June 6, 1958. First, defendant distorts the record since plaintiff did not deny having received money from his father on this date; he indicated that he did not know whether he had or not. More importantly, nowhere does defendant relate this transaction to the facts of this case or the immediate issues involved. The point raised by defendant is devoid of materiality and does not constitute evidence of any fraud whatever.[7]

---

[7] Defendant's brief on this appeal raises several questions not specifically urged in the court below, all going to the issue of plaintiff's alleged untruthfulness. In the exceptions filed below, defendant did, however, take issue generally with the chancellor's refusal to find as a fact that plaintiff was untruthful. In his brief filed here, defendant urges:

(1) That plaintiff falsely claimed a credit of $4,750. The record reveals that such a credit was erroneously claimed by Merton Shapiro, but not by plaintiff.

(2) That plaintiff falsely denied this same $4,750 was defendant's share of proceeds recovered in an anti-trust suit. The allegation is without record support and is a matter wholly collateral to the primary issues in this case.

(3) That plaintiff falsely denied that a certain exhibit was made in his presence. Again, the record does not support defendant's charge. Moreover, this exhibit related to matters collateral to the issues here.

Bennard signed an affidavit to the reply to new matter "on behalf of himself and his co-plaintiff." The affidavit was executed at a time when both Merton and Bennard were still parties of record. At trial, Bennard admitted that his co-plaintiff did not authorize him to execute the affidavit on his behalf, but that he did so on the advice of counsel who represented both him and his brother. Defendant now contends that Bennard's conduct in this regard renders his hands unclean. The court below attached no significance to this strained argument, nor do we.

Defendant's second major argument is that the decree is invalid because a fatal variance exists between plaintiff's proof and his complaint. Plaintiff's complaint simply pleaded the agreements and sought specific performance. Defendant's answer and new matter prompted a reply by Bennard and Merton that defendant had agreed to give them the options if they would surrender their rights under a certain lease and become stockholders in the theatre corporation.[8] Defendant now contends that plaintiff utterly failed to prove, as he pleaded, that the surrender of the leasehold formed part of the consideration for the option and that, therefore, the decree may not be sustained. This position is wholly without merit. As indicated, the complaint relied upon the agreements as written.

The chancellor tried this case with ability, care and patience. Because of the many collateral issues in-

_____

(4) That plaintiff fraudulently asserted that the partnership of which he was previously a member transferred a certain sum of money to Arcadia Theatre Company on January 7, 1959. Plaintiff's actual testimony on this subject was that the partnership and the corporation "merged" in December, 1958, and that money was paid to the corporation to meet partnership liabilities assumed by the corporation. There is nothing fraudulent about the testimony. Furthermore, this matter is also entirely collateral to the basic issues raised by this litigation.

[8] See note 1, supra.

jected, an extensive record was created far out of proportion to the narrow issues involved. Certainly, the parties had more than their day in court. A careful review of the record satisfies us that the decree as entered is just and appropriate. It should not be disturbed.

Decree affirmed. Appellants' costs to be paid by Samuel Shapiro. Appellee to pay own costs.