351 A.2d 236

**Donald G. STAUFFER, Appellee,**

v.

**Theresa E. STAUFFER, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 23, 1975.

Decided Jan. 29, 1976.

560

562

564

Robert S. Gawthrop, III, West Chester, for appellant.

Fred T. Cadmus, III, West Chester, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION

EAGEN, Justice.

On April 23, 1970, appellee Donald G. Stauffer joined with his wife, appellant Theresa E. Stauffer, in conveying to appellant alone for the stated consideration of one dollar the land and residence which both owned and had been occupying as tenants by the entireties. Subsequently, he brought this action in equity in the Court of Common Pleas of Chester County to compel a reconveyance. After a trial, the chancellor made his adjudication and

entered a decree nisi in favor of Mr. Stauffer which granted the relief sought; on November 29, 1974, the court en banc dismissed the exceptions of Mrs. Stauffer and made the decree final. This direct appeal followed.[1]

The record discloses that the parties were married on October 17, 1953, and that they became the owners of the land in question by means of a gift from Mrs. Stauffer's parents on August 3, 1956; their house was subsequently built and paid for primarily, if not entirely, out of the earnings of Mr. Stauffer. Toward the end of March, 1970, Mrs. Stauffer became suspicious that her husband had become involved with another woman, and on March 26 she consulted an attorney for advice about her domestic situation. Shortly thereafter, she confronted her husband with her suspicions, and he admitted to her not only that he had been engaged in an adulterous relationship, but that the "other woman" was Mrs. Stauffer's own sister, Victoria Gavin. Subsequently, Edward Gavin, the husband of Victoria, came to the Stauffer home, and in the presence of Mrs. Stauffer and Mr. Gavin, Mr. Stauffer wrote out a "confession" in which he detailed his involvement with Mrs. Gavin.

The foregoing facts were essentially undisputed. Other events leading up to and following the aforementioned conveyance, however, and particularly the relationship and understanding of the parties during this period, could be determined for the most part only from the often-contradictory testimony at trial of Mr. and Mrs. Stauffer. After hearing the testimony, the chancellor made the following pertinent findings of fact:

"3. In late March or early April, 1970, Plaintiff made confession of his adulterous relationship with Defendant's sister, Victoria Gavin, which activities had ended in late March, 1970.

1. See Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, No. 223, art. II, § 202, 17 P.S. § 211.202(4).

"4. The Defendant consulted with Lawrence Sager, Esquire, four or five times between March 26, 1970 and April 23, 1970.

"5. The Defendant had been highly emotional and distraught during the period of March 26–April 23, 1970.

"6. The Defendant related to the Plaintiff that Mr. Gavin would be down at the house 'with the law.'

"7. The Plaintiff did evidence a fear of a lawsuit by Mr. Gavin.

"8. On April 23, 1970, the Plaintiff agreed to transfer his interest in the jointly-held property after a prolonged hysterical outburst by the Defendant.

"9. On April 23, 1970, at a meeting at Mr. Sager's office, Plaintiff transferred his interest in the jointly-held property to the Defendant.

\* \* \* \* \* \* \* \*

"11. The Plaintiff, at the April 23rd meeting was advised by Mr. Sager of his right to consult counsel of his choice and he elected to proceed without consulting an attorney.

"12. At all times during their marriage, the Plaintiff had made any important financial decisions, upon which the Defendant relied.

"13. At the meeting of April 23, 1970 Plaintiff expressed concern over the security of the 'homestead' for his wife and children.

"14. Until the date of transfer, the Plaintiff and Defendant had continued to live together and carry on marital relations.

"15. At the meeting of April 23, 1970 the prevailing mood was that the Plaintiff and Defendant would continue to live together.

"16. Shortly after the conveyance of the property on April 23, 1970, marital relations between the Plaintiff and Defendant totally ceased.

"17. After the conveyance of the property, the Defendant and the children evidenced a disregard for the Plaintiff."

Drawing upon these findings, the chancellor concluded that appellant held what had been her husband's share in the property as constructive trustee for him because "the transfer of Plaintiff's interest in real property jointly held was fraudulently induced by threats and misrepresentations of the Defendant," and that "Plaintiff is entitled to a reconveyance of his interest in the real property." After the argument before the court en banc, he in another opinion further concluded that appellee was not barred from affirmative relief by the clean hands doctrine, either because of his adultery with Mrs. Gavin or his attempted fraudulent conveyance. Appellant herein contests each of these conclusions.

Initially, we note that on appeal we are bound by the chancellor's findings of fact, particularly if approved by the court en banc, to the same extent as we would be bound by the factual determinations of a jury. The test in either case is whether the findings are adequately supported by the record. The chancellor's findings are entitled to particular weight in a case in which the credibility of the witnesses must be carefully evaluated, because he has had the opportunity to hear them and to observe their demeanor on the stand. *Charles v. Henry*, 460 Pa. 673, 334 A.2d 289 (1975). In this case, since these findings are indeed adequately supported in the record, though largely dependent on the unsupported testimony of Mr. Stauffer and sometimes contradicted by that of Mrs. Stauffer, our task is to determine whether the factual inferences and legal conclusions derived from them are correct.

Although we have held that ordinarily, when a husband transfers property to his wife, a presumption arises that a gift was intended—*Lapayowker v. Lincoln*

*College Preparatory School*, 386 Pa. 167, 125 A.2d 451 (1956) [2]—such a presumption is, of course, rebuttable, and here the chancellor found that there was sufficient credible evidence to establish a constructive trust rather than a gift. The imposition of a constructive trust, unlike the finding of an express or a resulting trust, does not require that the parties specifically intended to create a trust; it is an equitable remedy designed to prevent unjust enrichment. *Buchanan v. Brentwood Fed. Sav. & Loan Ass'n*, 457 Pa. 135, 320 A.2d 117 (1974); *Pierro v. Pierro*, 438 Pa. 119, 264 A.2d 692 (1970); Restatement of Restitution § 160 (1937); 5 A. Scott, Law of Trusts §§ 404.2, 462 (3d ed. 1967). There is thus no rigid standard for determining whether the facts of a particular case require a court of equity to impose a constructive trust; the test is whether or not unjust enrichment can thereby be avoided. This Court has repeatedly cited with approval the oft-quoted language of Justice (then Judge) Cardozo in *Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 386, 122 N.E. 378, 380–81 (1919):

> "A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest equity converts him into a trustee . . . . A court of equity in decreeing a constructive trust is bound by no unyielding formula. The equity of the transaction must shape the measure of relief."

2. In *Butler v. Butler*, 464 Pa. ——, 347 A.2d 477 (1975), we held that in light of the passage of the Pennsylvania Equal Rights Amendment, Pa.Const. Art. I, § 28 (adopted May 18, 1971), a contribution to entireties property by either husband or wife must be presumed a gift to the other. Since *Butler* merely states that the presumption of gift, previously applied only to transfers by the husband, must be applied equally to transfers by either party, it contains nothing to disturb the established presumption of gift in cases where, as here, the transfer was from the entireties estate to the wife alone.

See, e. g., *Buchanan v. Brentwood Fed. Sav. & Loan Ass'n,* supra at 152, 320 A.2d at 126; *Shapiro v. Shapiro,* 424 Pa. 120, 129, 224 A.2d 164 (1966); *Chambers v. Chambers,* 406 Pa. 50, 54–55, 176 A.2d 673, 675 (1962).

Appellant strenuously argues that in this case no confidential relationship existed between the parties at the time of the transaction, and that therefore there can be no constructive trust; she cites *Foster v. Schmitt,* 429 Pa. 102, 107, 239 A.2d 471 (1968) for the proposition that a confidential relationship requires that the transferee occupy toward the transferor "such a position of advisor or counselor as reasonably to inspire confidence that he will act in good faith for the other's interest" and maintains that this was not the situation here. Appellant is mistaken, however, in assuming both that the chancellor found a confidential relationship in this case and that he needed to do so in order to impose a constructive trust.

The chancellor's determination was based not on the abuse of a confidential relationship, but on his conclusion that the transfer was "fraudulently induced by threats and misrepresentations of the Defendant." It is well-established that "Where the owner of property transfers it, being induced by fraud, duress or undue influence of the transferee, the transferee holds the property upon a constructive trust for the transferor," Restatement of Restitution § 166 (1937), and that where the transfer is so induced, a constructive trust will be imposed without proof of a confidential relationship. See *Chambers v. Chambers,* supra; *Christy v. Sill,* 95 Pa. 380 (1880). Whether or not a confidential relationship exists in a given case is usually a question of fact to be determined by no inflexible rule but by a weighing of the particular factors present in that case. The mere finding of such a relationship does not in itself cause a constructive trust to be imposed; its effect is simply to impose a burden upon the party benefiting from the trans-

action of proving that he took no unfair advantage of his relationship with the other. By the same token, absent a finding of confidential relationship, the complaining party may still prove unjust enrichment. See generally Note, Confidential Relationships in Pennsylvania Law, 97 Pa.L.Rev. 712 (1949).

But although the chancellor's conclusion in this case did not depend upon a finding of confidential relationship, we must still examine the actual relationship between the parties to determine whether or not the requisite unjust enrichment was present. In doing so, we must focus on the relationship between the parties at the time of the transaction in question. *Hamberg v. Barsky*, 355 Pa. 462, 50 A.2d 345 (1947). Therefore, although it is a pertinent factor, it is not necessarily a controlling one that the chancellor found "at all times during their marriage, the Plaintiff had made any important financial decisions, upon which the Defendant relied." Mr. Stauffer's decision to turn over to his wife, without meaningful consideration, his share of what the record indicates was by fair his largest asset, was not an ordinary "important financial decision" and can only be interpreted in relation to the unique situation in which he found himself at that time. Furthermore, even if the relationship between the parties was not the sort in which our courts have traditionally found a confidential relationship sufficient to shift the burden of proof, we do not have to regard the transaction as merely an arm's-length one. Human relationships are frequently too complex to be classified simply as either "confidential" or "arm's-length"; a relationship can have elements of confidentiality without being strictly a "confidential relationship," and less diligence is required of a plaintiff who relies to his detriment on the closeness of his relationship to the defendant than of one who deals on a genuinely arm's-length basis. See *Zahn v. McMillin*, 179 Pa.

146, 36 A. 188, 57 Am.St.Rep. 591 (1897); *Hedges v. Primavera*, 218 F.Supp. 797 (E.D.Pa.1963).

The record in this case indicates that when Mrs. Stauffer first became suspicious and later learned of her husband's adultery, her confidence in him was understandably severely undermined, and that her visits to a lawyer during this period were to obtain advice not only about the possibility of straightening out her marital difficulties, but also about securing her rights and those of her children in the event of a separation. We can also infer that she was particularly distressed that the woman her husband had become involved with was her own sister. Yet the chancellor, with sufficient basis in the record, found that up to the time of the conveyance the parties "continued to live together and carry on marital relations" and that at the time of the conveyance "the prevailing mood was that the Plaintiff and Defendant would continue to live together."

As for Mr. Stauffer, the record clearly suggests, whether or not he had formerly been the dominant party in the relationship, that after the discovery of his adultery he was not. His writing out a confession in the presence of his wife and Mr. Gavin suggests a sense of guilt, if not contrition. According to his testimony, his eventual decision to convey the property at his wife's urging came after she had repeatedly told him of her fears of the dire consequences of Mr. Gavin's purported lawsuit, and immediately after "a prolonged hysterical outburst" during which she first drove the family car so recklessly that he pulled the keys out of the ignition in fear and she later drove wildly away from her husband and her father after rejecting her husband's suggestion, agreed to by her father, that the property be conveyed not to her but to the children.[3] He further testified that

3. It can, of course, be argued that Mrs. Stauffer's alleged behavior on this occasion is evidence not of her dominance, but of her weakness, but this would be to ignore the extent to which weakness, whether real or apparent, can be a source of power over

his only reason for yielding to his wife's urging about the property was the fear, induced by her, of the lawsuit, together with his impression that by agreeing to the transfer, he would "save the house for all of us, the family; not just for my wife and the children, for all of us as a family."

In addition, Mr. Stauffer repeatedly testified that he finally agreed to, sign over the property to his wife because he had faith in her:

"Q. Well, what was your reaction to what your wife said? What was your state of mind?

"A. Well, my state of mind, I was worried, and I didn't know if I was going to be sued or not. But I, as we went along with things there, why, I more or less had faith and things in her own and I agreed to sign the house and things over to her.

"Q. What do you mean 'faith in her', faith in what way?

"A. Well, I trusted her and things there, and she'd been faithful to me for years and all. . . ."

Despite his own prior unfaithfulness, we cannot say that such faith was either implausible or unreasonable, given that his wife had always acted in good faith toward him in the past, he had confessed and terminated his adulterous affair, and—according both to his testimony and the chancellor's finding—the mood at the time of the conveyance was that husband and wife would continue to live together. Nor is the plausibility of this faith contradicted by his admission that he was told by his wife's lawyer that he was acting for Mrs. Stauffer alone:

"Q. What else did Lawyer Sager say to you then?

one who feels a sense of guilt or responsibility with regard to that person. Appellant points out that *Stewart v. Hooks*, 372 Pa. 542, 94 A.2d 756 (1953) approves a presumption of masculine dominance in a marital relationship. Such a presumption can, of course, be overcome by the facts in a particular case, but in any case such a one-sided presumption with regard to the sexes can no longer stand. See *Butler v. Butler, supra.* .

"A. He told me that I was, that I could have counsel, you know, see my own attorney and things; and I said I didn't have—I have faith in her and things, that I didn't have to see my own attorney. I figured the house would still be between the two of us, even if I did sign it over." [4]

We cannot therefore find that the conveyance was an arm's-length transaction. In this regard, it is significant that in her pleadings, while averring that it was "an arm's-length transaction, wherein defendant was endeavoring to insure some form of security for her children," appellant also averred that "plaintiff agreed to convey his interest in the subject real estate to defendant to manifest his trustworthiness and good faith with respect to defendant." This is not the language of an arm's-length transaction, and transactions entered into to manifest trustworthiness and good faith imply a mutuality of both.

It remains to be determined, nevertheless, whether or not the chancellor erred in his conclusion that Mrs. Stauffer took unfair advantage of Mr. Stauffer and fraudulently obtained his share of the property by means of threats and misrepresentations. Although the record supports the conclusion that Mrs. Stauffer's behavior with regard to Mr. Gavin's threatened lawsuit had a coercive effect on Mr. Stauffer, there is nothing in this alone to suggest that the lawsuit had not indeed been threatened or that her fears of its consequences were not genuine; in this regard, it may have been significant, however, that in his deposition her attorney testified that

4. The lawyer testified by deposition that Mrs. Stauffer had said nothing to him about an impending lawsuit, and that his understanding from her was that the parties had agreed upon the transfer as a means of securing the wife and children "in the eventuality there was a break-up of the marriage." Mr. Stauffer's testimony, however, indicates that he connected his wife's urging that he save the house by making the conveyance with the advice she was receiving from the attorney.

he did not recall her mentioning the lawsuit to him and that her father also testified he remembered nothing being said about it at the time.[5] The chancellor, rather, based his ultimate conclusion of misrepresentation on the contrast between the apparently ongoing marital relationship he found before the conveyance and the "total abatement" of the relationship on the part of Mrs. Stauffer that followed shortly after it:

"Immediately after the transfer of April 23, 1970, the Defendant effected a total abatement of family atmosphere toward the Plaintiff in the household, ceased sexual relations with the Plaintiff and moved out of the bedroom. Admittedly, the Plaintiff and Defendant were in the midst of a domestic problem as evidenced by the confession of his adulterous relationship with the Defendant's sister, but this Court is swayed by the severe contrast in Defendant's behavior immediately after the transfer, the 'hysterical outbursts' immediately prior to the transfer, and the constant conversation concerning the threat of a lawsuit by Mr. Gavin. These factors lead us to the belief that the Defendant sought to secure complete interest in the property for herself and the Chancellor is satisfied that the means employed to obtain such an interest amounted to such undue influence through misrepresentations and threats as to grant the Plaintiff a reconveyance of his interest in the real property."

It is clear that a fraudulent intention at the time of a transaction can be inferred from the totality of the circumstances surrounding the transaction, including subsequent conduct on the part of the defendant. See *DeBernard v. DeBernard*, 384 Pa. 194, 120 A.2d 176 (1956); *Grove v. Kase*, 195 Pa. 325, 45 A. 1054 (1900). We cannot, therefore, find that the evidence was insuf-

5. Mr. Gavin did not testify at the trial. The record indicates that he brought no lawsuit, however, and that such an action is now barred by the statute of limitations.

ficient to support the chancellor's conclusion in this case.[6]

Appellant further contends that, regardless of whether the imposition of a constructive trust would ordinarily have been justified, appellee should have been barred from affirmative relief because, as a result both of his attempted fraudulent conveyance and of his adultery, he did not come into a court of equity with clean hands. The clean hands doctrine, however, does not require that a plaintiff be denied equitable relief merely because his conduct has been shown not to have been blameless. The bar of unclean hands is applicable in Pennsylvania only where the wrongdoing of the plaintiff directly affects the equitable relationship subsisting between the parties and is directly connected with the matter in controversy. *Pennsylvania Society for the Prevention of Cruelty to Animals v. Bravo Enterprises, Inc.,* 428 Pa. 350, 237 A.2d 342 (1968). Furthermore, the application of the doctrine to deny relief is within the discretion of the chancellor, and in exercising his discretion the chancellor is free not to apply the doctrine if a consideration of the entire record convinces him that an inequitable result will be reached by applying it. *Universal Builders, Inc. v. Moon Motor Lodge, Inc.,* 430 Pa. 550, 244 A.2d 10 (1968); *Shapiro v. Shapiro,* 415 Pa. 503, 204 A.2d 266 (1964). In the present case, we do not find that the chancellor abused his discretion in declining to apply the doctrine.

6. In his discussion the chancellor stated that the "total abatement" of marital relations followed "immediately" after the transfer, while his finding of fact was that it occurred "shortly after the conveyance." Mr. Stauffer actually testified that his wife moved out of their bedroom and became completely estranged from him on the third day after the conveyance. While the legal conclusion of fraud and misrepresentation would have been more strongly supported had the record indicated that the termination of marital relations was immediate rather than a few days later, we cannot find as a matter of law that the chancellor's conclusion was incorrect, since there is no requirement that the subsequent conduct that will justify an inference of fraudulent intent be immediate.

In both his pleadings and his testimony at trial, Mr. Stauffer indicated that he conveyed the property in order to save it from being seized to satisfy judgment in Mr. Gavin's purported lawsuit based on the alienation of his wife's affections. It is clear that one with a legal claim against a person at the time that person makes a conveyance, even one that has not yet been reduced to judgment or even filed, is a future creditor who is entitled to set aside the conveyance if he can show it was made with actual intent to hinder, delay, or defraud present or future creditors. Uniform Fraudulent Conveyance Act, Act of May 21, 1921, P.L. 1045, No. 379, § 7, 39 P.S. § 357; *Baker v. Geist*, 457 Pa. 73, 321 A.2d 634 (1974); *Butler County v. Brocker*, 455 Pa. 343, 314 A.2d 265 (1974). Indeed, it has been specifically held that a husband with an existing though unliquidated claim for damages for the alienation of his wife's affections is a creditor entitled to set aside a conveyance if it is found to be fraudulent. *Hatton v. McElhaney*, 20 Pa. D. & C. 110 (1933). There can be no doubt in the instant case that Mr. Stauffer intended to make a fraudulent conveyance. The fact remains, however, that he was mistaken in his assumption that his entireties property jointly held with his wife could have been reached by a creditor of him alone; property owned by tenants by the entireties is not subject to the debts of either spouse, and they may alien it without infringing upon the rights of their individual creditors. *Murphey v. C. I. T. Corp.*, 347 Pa. 591, 33 A.2d 16 (1943). Since Mr. Gavin could not have reached the property before the conveyance, it follows that the conveyance itself could not have been fraudulent as to him.[7]

7. The issue has not been raised, and therefore we have not considered whether Mr. Stauffer would have been entitled to the imposition of a constructive trust on the theory that the conveyance was made under a mistake of law. See 5 A. Scott, Law of Trusts § 465 (3d ed. 1967). Cf. *Norard Hosiery Mills, Inc. v. Orinoka Mills*, 416 Pa. 454, 206 A.2d 56 (1965); *First National Bank of Sunbury v. Rockefeller*, 333 Pa. 553, 5 A.2d 205 (1939).

 Appellant nevertheless argues that the applicability of the clean hands doctrine in this case should be determined, not by whether or not the conveyance was actually fraudulent, but by whether or not appellee's intent was fraudulent; she urges that in the criminal law impossibility is no defense to a charge that one has attempted a crime. The considerations pertinent to the criminal law, however, are not necessarily those pertinent in a court of equity. Although there are older cases to the contrary, it is now well-settled in Pennsylvania that the clean hands doctrine is only applicable to the equitable relations between the parties and that a party not affected by the fraud, whether actual or intended, is in no position to assert it as grounds for the denial of affirmative relief. See *Dales v. Muir*, 351 Pa. 187, 40 A.2d 476 (1945); *Vercesi v. Petri*, 334 Pa. 385, 5 A.2d 563 (1939); *Asam v. Asam*, 239 Pa. 295, 86 A. 871 (1913); *Bechtel v. Ammon*, 199 Pa. 81, 48 A. 873 (1901); *Walacavage v. Walacavage*, 168 Pa.Super. 334, 77 A.2d 723 (1951). This is particularly so in a case like the present one, in which the chancellor determined that the attempted fraudulent conveyance was induced by the very party who now asserts the claim of unclean hands with respect to the transaction. See *Palmer v. Foley*, 305 Pa. 169, 157 A. 474 (1931).

██ As for Mr. Stauffer's adulterous relationship with Mrs. Gavin, it is clear that it directly affected the equitable relationship between the parties, but the question remains whether or not it was directly connected with the subject matter in controversy. Certainly there can be no doubt that the transaction in question would not have occurred had there been no adultery, and we therefore cannot say that it was merely collaterally or indirectly connected with it. Cf. *McLaughlin v. McLaughlin*, 410 Pa. 1, 187 A.2d 905 (1963); *Hartman v. Cohn*, 350 Pa. 41, 38 A.2d 22 (1944); *Belmont Laboratories, Inc. v. Heist*, 300 Pa. 542, 151 A. 15 (1930). Nev-

ertheless, we cannot find on the facts of this case that the chancellor abused his discretion in declining to bar appellee from affirmative relief.

This Court has stated that "Equity will not stand aside a plaintiff whose rights have been transgressed and permit them to be appropriated because of previous bad conduct, and if the plaintiff offers reparation for what he has done, he may be granted relief, contingent upon repairing the injury he has inflicted." *Hartman v. Cohn,* supra, 350 Pa. at 46, 38 A.2d at 25. It may well be that the injury appellee has done to his wife and to his marriage is indeed irreparable, yet the record indicates that after the discovery of his adultery he has acted in good faith toward appellant. After confessing and terminating the adulterous relationship, he made the conveyance in question, according to appellant's own pleadings and testimony, for the purpose of securing his wife and children from the consequences of his prior conduct. The record also shows that after the conveyance he continued to make the mortgage payments due on the property. As for his wife, according to the chancellor's findings, after she learned of the adultery, she continued to live with him and maintain a marital relationship until the time of the transfer in issue. The chancellor here found that appellant fraudulently induced appellee to make the transfer after she learned of the adultery and while she continued to live with him as his wife. It would be inequitable to permit her to be unjustly enriched because of his previous adulterous conduct.[8]

8. Compare *Williamson v. Williamson*, 57 Pa.D. & C.2d 413 (1971). There the husband abandoned his wife and home and maintained adulterous relationships for three and one-half years. During this period his wife, daughter, and son-in-law paid all tax, insurance, and repair expenses in connection with the home. Finding a court order to support his wife too onerous, he finally threatened to move back into the house unless his wife released him from the order. When she refused, he tried to force his way into the ·house, and when he was ejected, he brought an action in equity against his wife, son-in-law, and daughter seeking an injunction compelling them to cease interfering with his right of

The decree is affirmed. Costs to be paid by the parties in equal parts.

JONES, C. J., and POMEROY and NIX, JJ., concur in the result.

ROBERTS, J., filed a dissenting opinion.

ROBERTS, Justice (dissenting).

The chancellor's findings of fact do not support his conclusion that the transfer of appellee's interest in real property "was fraudulently induced by threats and misrepresentations of [appellant]." The findings of fact support with equal force a conclusion that appellee, the financial decisionmaker of the family, intended to make a gift to appellant because of his feelings of remorse and his desire to protect the welfare of his family.

As the majority correctly notes, a transfer of property from husband to wife gives rise to the presumption of a gift. *Butler v. Butler,* 464 Pa. ——, 347 A.2d 477 (1975); *Clay v. Keiser,* 460 Pa. 620, 334 A.2d 263 (1975); *Shapiro v. Shapiro,* 424 Pa. 120, 224 A.2d 164 (1966); *Lapayowker v. Lincoln College Preparatory School,* 386 Pa. 167, 125 A.2d 451 (1956). "In order to rebut that presumption and establish a resulting trust in [the donor's] favor, the [donor] must support his claim by clear, explicit and unequivocal—though not necessarily uncontradicted—evidence." *Shapiro v. Shapiro,* supra, 424 Pa. at 129, 224 A.2d at 169; see *Clay v. Keiser,* supra at 626,

peaceful possession in the entireties property. In the course of the hearing, his wife testified that she would admit him into the home if he stopped his philandering and resumed the marital relationship, but he candidly admitted that he had no intention of doing so and only brought the action in order to force his wife to release him from the support order. Confronted with this continuing course of opprobrious conduct toward the defendant, far in excess of the original adultery, the chancellor applied the clean hands doctrine and barred him from equitable relief.

580

334 A.2d at 266–67; *Lapayowker v. Lincoln College Preparatory School,* supra, 386 Pa. at 171–72, 125 A.2d at 454.

The evidence here is insufficient to meet this well-established standard, which the majority inexplicably ignores. The majority relies on events which occurred subsequent to the transfer, including the "total abatement" of marital relations either the day after or three days after the transfer. This does not support, by "clear, explicit and unequivocal" evidence, appellant's intent to defraud her husband. Numerous other possible explanations exist for this behavior. I would reverse the decree.