537 A.2d 377

Londonderry Township, a municipal subdivision of the Commonwealth of Pennsylvania *v.* Paul M. Geyer et al. Paul M. Geyer and Judith A. Geyer, his wife, Appellants.

Argued November 20, 1987, before Judges MAC-PHAIL and PALLADINO, and Senior Judge KALISH, sitting as a panel of three.

*Eugene E. Dice*, for appellants.

*James B. Pannebaker, Pannebaker and Jones, P.C.*, for appellee, Londonderry Township.

*Jefferson J. Shipman*, Deputy Attorney General, with him, *Richard P. Mislitsky*, Deputy Attorney General, *Mark E. Garber, Jr.*, Chief, Torts Litigation Unit, and *LeRoy S. Zimmerman*, Attorney General, for appellee, Department of Environmental Resources.

OPINION BY JUDGE PALLADINO, January 29, 1988:

Paul M. and Judith A. Geyer (Appellants) appeal from an order of the Dauphin County Court of Common Pleas denying their motion for post-trial relief and affirming the adjudication which: (1) enjoined Appellants to abate the malfunctioning sewage disposal system at Appellants' mobile home park in Londonderry Township (Township); (2) denied Appellants' counterclaim against the Township; and (3) dismissed Appellants' complaint against the Department of Environmental Resources (DER) and DER's employee, Charles D. Ferree, Jr. We affirm.

On November 21, 1980, Appellants entered into a sales agreement with Ray and Alice Roth to purchase the Roths' mobile home park located in the Township. The sewage disposal system in the park had a long history of operating problems. Appellant Paul Geyer (Geyer), who was in the business of installing sewage disposal systems, had been employed on occasion by the Roths to repair the park's system. The sales agreement between Appellants and the Roths was made contingent upon approval from the necessary authorities that the park could continue as an operating mobile home park. The Township supervisors indicated to Geyer that the necessary mobile home park permit would be issued if he could correct the sewage problem.[1] After the execution of the sales agreement, Geyer began the application process, pursuant to the Pennsylvania Sewage Facilities Act (Act),[2] for an elevat-

---

[1] In connection with the sale and to secure the necessary permits, Geyer signed this statement: "After purchasing Roth's Trailer Park I will comply with all State and Township regulations pertaining to Mobile Home Parks and all on-lot sewage regulations. The renovations and clean-up will be completed on June 1, 1981." Plaintiffs' [Township's] Exhibit 7. The Township Supervisors signed this statement:

> If Mr. Paul Geyer purchases Roth's Trailer Park, cleans it up and will assure the Township Supervisors it will be kept clean and that the sewerage problems will be properly handled through the installation of sand mounds approved by both the County and the Sanitation Officer we would have no objections to it being run as a mobile home park. Project should be completed by June 1, 1981.

Plaintiff's Exhibit 8.

[2] Act of January 24, 1966, P.L. 1535, as amended, 35 P.S. §§750.1-750.20. Section 7 of the Act, 35 P.S. §750.7(a), requires that a permit be obtained from the local agency (here the Township) prior to installing, constructing, altering or requesting bids to construct a sewage system. Regulations promulgated pursuant to the Act require the local agency's sewage enforcement officer

ed sand mound sewage disposal system which would utilize two separate sand mounds. On November 25, 1980, Lloyd Stipe, the Township sewage enforcement officer, conducted deep probe tests at the site of the proposed system to determine the limiting zone of the soil.[3] One deep probe test at each area on which an elevated sand mound was proposed passed the 20 inch limiting zone requirement then in effect.[4] Geyer first submitted an application in December, 1980. Stipe

(SEO) to investigate permit applications and issue permits to build and operate sewage disposal systems. *See* Chapters 71, 72 and 73 of Title 25 of the Pennsylvania Code. An SEO is defined as: "The official of the local agency who issues and reviews permit applications and conducts the investigations and inspections as are necessary to implement the act and the rules and regulations relating to the act." 25 Pa. Code §71.1.

[3] The regulations in effect at that time, and the current regulations, define "limiting zone" as:

Any soil horizon in the soil profile or underlying stratum which shall include indication of seasonal watertable, including perched water table, determined by direct observation or by observation of soil mottling, or rock formations, and impervious strata which shall include rock which is so slowly permeable that it prevents downward passage of effluent, rock with open joints or solution channels, and masses of shattered rock fragments with insufficient fine soil to fill the voids between the coarse fragments.

25 Pa. Code §71.11.

[4] This requirement was codifed at 25 Pa. Code §73.111(a)(3) and can be found at Pa. Code sequential serial number 17863. This section stated: "Elevated sand mounds shall not be utilized on soils where the seasonal water table as determined by mottling or direct observations, rock formations or impervious strata occur at less than 20 inches from the surface." The current regulation containing the specific requirements for elevated sand mounds appears at 25 Pa. Code §73.55 and contains no specific requirement concerning the depth of the limiting zone of the soil on which the mound is to be built.

submitted it to DER, specifically to Charles Ferree who was DER's sanitarian[5] for the region, for review. Ferree notified Stipe on December 11, 1980 that the application was insufficient and requested a number of additional documents.[6] Even though no sewage disposal permit had been obtained, the sale of the park to Geyer was completed on January 23, 1981.

In February or March, 1981, Ferree and George W. Mehaffie, a DER employee familiar with the sewage problems at the park, met with Geyer and Geyer's son Steven[7] to discuss the proposed system. Subsequently, Geyer submitted drawings for a pressurized elevated sand mound sewage disposal system. Ferree informed the Township supervisors, by letter dated July 1, 1981, that Geyer's application for an experimental[8] pressurized elevated sand mound system appeared to meet DER's proposed design criteria for such a system[9] and gave the Township permission to issue an experimental system permit. Plaintiff's Exhibit 10. A copy of the letter was sent to Stipe and Geyer. The letter qualified DER's permission for the permit with six conditions, one being that "[i]n the event of a malfunction, the ap-

---

[5] DER sanitarians are responsible for implementing the Act and its regulations, among other responsibilities. N.T. at 354.

[6] Ferree received the necessary site investigation details from Stipe on March 11, 1981. N.T. at 358-59.

[7] Steven drew all the plans submitted to DER with the applications. In 1981, Steven received two engineering degrees from Penn State. N.T. at 264-65.

[8] The regulations in effect at that time defined experimental as: "Any system design not considered in the Rules and Regulations of the Department which is proposed for use for the purpose of testing and observation." This regulation can be found at Pa. Code sequential serial number 17837. The current definition at 25 Pa. Code §73.1 is basically the same.

[9] The proposed regulations referred to were published on March 28, 1981 and can be found at 11 Pa. Bull. 1158-62.

plicant is responsible for corrections or replacement of the system in accordance with the regulations of the time." On July 13, 1981, Stipe issued the permit allowing Geyer to construct the system.

Installation of the system was completed in December, 1981. Stipe and Mahaffie were present when the system was tested on December 2, 1981. In his report to Ferree, Mehaffie indicated that the test was successful.[10] Stipe approved the system for use on December 2, 1981.

In 1983, at the Township's request, Ferree visited the park and observed that liquid was seeping from one of the sand mounds and running down the road. Tests were performed on this effluent which indicated it contained human sewage. Plaintiff's Exhibit 11 and 13. A sewage system which discharges partially treated sewage to the surface of the ground is in violation of 35 Pa. Code §73.11(d).

Geyer was informed of the violation and instructed to correct it. As a result of the violation, Geyer's permit to operate the system was revoked, pursuant to Section 7(b)(6)(v) of the Act, 35 P.S. §750.7(b)(6)(v),[11] on January 4, 1984. On January 13, 1984, the Township denied Geyer's application for a mobile home park permit for 1984. Geyer did not contest either action.

---

[10] Mehaffie also stated in his report the following:

For the record it should be noted that the elevated sand mounds were not constructed as shown on the plans & specs. Mr. Geyer used the current technique of berm construction rather than the sand pile configuration of proposed Chapter 73. This is probably of no consequence but it is worth noting.

Defendants' [Appellants'] Exhibit 2.

[11] This section states: "If the local agency determines that: . . . (v) the permittee has violated the rules and regulations of the department under which the permit was issued, the permit shall be revoked."

The Township, on July 25, 1984, initiated an equity action, pursuant to sections 12 and 14 of the Act, 35 P.S. §§750.12, 750.14,[12] against Appellants, seeking to have Appellants directed to remedy the malfunction. Appellants responded by raising the defense of equitable estoppel and by filing a counterclaim against the Township. In their counterclaim, Appellants alleged (1) that the Township was negligent in investigating the application and in issuing the permit and that such negligence constituted a breach of the Township's duties under the Act and (2) that Appellants had relied on the Township's negligent actions to their detriment in purchasing the park and installing the system. Additionally, Appellants filed a complaint against DER and Ferree as additional defendants, alleging that DER and Ferree negligently approved the system and that Ferree made assurances to Geyer that "if water leaked from the system [it] would already have been renovated prior to discharge and . . . therefore there would be no problem even if the system began [to] discharge water to the surface of the ground." The Township then filed a complaint against DER and Ferree, alleging that DER and Ferree "are solely liable for authorizing the alleged negligent or otherwise wrongful issuance of [the permit].".

DER and Ferree filed preliminary objections to Appellants' and the Township's complaints against them, asserting that they were immune to suit. The preliminary objections were denied. Subsequently, DER and Ferree raised the defense of sovereign immunity in

---

[12] Section 12(a) of the Act gives the Township "the power to institute suits in equity to restrain or prevent violations of section 7 of the act" and section 14 of the Act states that "[a] violation of section 7 of this act shall constitute a nuisance and shall be abatable in the manner provided by the law."

their answer and new matter[13] to both complaints. The Township raised the defense of governmental immunity to any negligence claims in an amended answer and new matter to Appellants' counterclaim.

Testimony was heard by the trial judge, sitting as a chancellor in equity, on October 3, 4, and 30, 1985. An adjudication was issued on May 1, 1986 in which Appellants were enjoined to abate the malfunctioning sewage disposal system at the mobile home park and their counterclaim against the Township was denied. The complaints against DER and Ferree were dismissed.

Appellants filed a motion for post-trial relief raising numerous objections to the adjudication.[14] On September 15, 1986, the motion was denied and the May 1, 1986 adjudication adopted with minor additions to the discussion section.[15] On appeal to this court, Appellants contend that: (1) the chancellor erred in not finding that the Township acted in negligent or willful violation of the Act and associated regulations in issuing the permit

---

[13] This is the proper procedure for raising the defense of immunity. Pa. R.C.P. No. 1030.

[14] Appellants' contention that counsel fees were improperly awarded to the Township was found to have merit and the direction to Appellant to pay counsel fees was eliminated from the final order.

[15] One addition to the adjudication was an alternative basis on which the dismissal of the complaints against DER and Ferree could be based. The addition stated:

> Because of the foregoing disposition of the matter, we did not discuss in the Adjudication another reason for dismissing the suit as to the DER and Charles D. Ferree, Jr. Briefly, the suit does not lie because it is founded only on allegations of negligence and does not set forth any claim allowed under the Act of September 28, 1978, P.L. 788, 42 Pa. C.S.A. §8522.

*Londonderry Township v. Geyer*, 107 Dauph. 69, 74-75 (C.P. Pa. 1986).

and approving the system, making the Township liable under a contract theory for damages suffered by Appellants; (2) the chancellor erred in not finding that DER and Ferree violated the Act and associated regulations in approving Appellants' application and construction of the system; (3) neither DER nor Ferree are protected by the doctrine of sovereign immunity "from liability in equity and under contract theory for improper, negligent, and unlawful issuance of permit approval . . . and the approval of the system as constructed;" and (4) the chancellor erred in not concluding that the Township was equitably estopped from bringing this equity action against Appellants. Our scope of review in equity matters is limited to determining whether the findings of fact of the chancellor are supported by substantial evidence, an error of law was committed or whether the chancellor abused his discretion. *Millstone Enterprises, Inc. v. Pennsylvania Department of Environmental Resources,* 101 Pa. Commonwealth Ct. 408, 516 A.2d 814 (1986).

Appellant's first and second contentions are no more than a claim that the chancellor's findings of fact are not supported by substantial evidence because the chancellor specifically concluded: "Under the evidence of this case, Geyers' [Appellants'] contention that their dilemma has been caused by the Township or DER is without substance. The harsh fact is that Geyers just don't have anyone to blame except themselves." *Londonderry Township,* 107 Dauph. at 74. For the reasons which follow, we conclude that the chancellor's findings of fact are supported by substantial evidence and provide the basis for the conclusions that Geyer alone was responsible for the malfunction and that the Township is not equitably estopped from seeking to have the Appellants directed to correct the malfunction. Therefore, it is unnecessary for us to reach Appellants' third contention, that sover-

eign immunity does not bar a claim in assumpsit or equity for wrongful conduct by DER and Ferree, and we decline to do so.

## SUBSTANTIAL EVIDENCE

The chancellor made the following findings of fact:

1. On November 21, 1980 the defendants, Paul M. and Judith A. Geyer, his wife, agreed to buy from Roy E. and Alice Bertha Roth, his wife, a mobile home park located at 3652 E. Harrisburg Pike in Londonderry Township. (Defendants' Exhibit 12).

2. The Mobile home park had a long history of problems with the sewage disposal system (N.T. 41, 126) and the defendant, Paul M. Geyer, knew of these problems (N.T. 280, 317-319, 339)

3. The defendant, Paul M. Geyer, is in the business of installing sewage disposal systems (N.T. 268, 279) and had been employed by the Roths to repair the system at the mobile home park (N.T. 76-77, 81). Geyer twice took the examination for the positions of municipal sewage enforcement officer (N.T. 318).

4. Upon entering into the sales agreement with the Roths to purchase the mobile home park, Paul M. Geyer, undertook to obtain a permit for installation of another sewage disposal system in the mobile home park (N.T. 281, Defendant's Exhibit 12), proposing to construct elevated sand mounds (N.T. 286-287).

5. In 1980, DER regulations regarding suitability required only one deep probe of the soil of a sewage treatment bed establishing at least a twenty (20) inch limiting zone. (N.T. 37) and Geyer knew this (N.T. 275, 320, 349-350).

6. On November 25, 1980, Lloyd Stipe, the Londonderry Township Sewage Enforcement Officer, at Paul Geyer's request (N.T. 78), measured two probe holes which Geyer had dug at the mobile home park; one under each of the beds on which sand mounds were later constructed, and found limiting zones of twenty-one (21) and twenty-two (22) inches (N.T. 79). Paul Geyer acknowledged that a suitable hole providing at least a twenty (20) inch limiting zone was found by Stipe in the bed of the upper sand mound (N.T. 283) and his son, Steven Geyer, that a passable hole was found in the bed of the lower mound (N.T. 266, 276, 320).

7. Stipe's measurements of the limiting zone in the probe holes was several inches deeper than those of a soils scientist, Merrill Runkle (N.T. 78) but such differences in locating the line of the limiting zone are not uncommon (N.T. 248-249).

8. Despite his belief that the soil suitability was marginal (N.T. 32, 339), Paul Geyer submitted his application for a permit on the measurements of Stipe (N.T. 324).

9. Steven Geyer, defendant's son and a graduate engineer, was present when Stipe made measurements on November 25, 1980 (N.T. 260) and he later drafted the plans for the elevated sand mound system for which Paul Geyer applied for a permit (N.T. 258, 259). Knowing that Hummel, the soils scientist engaged by Paul Geyer, would not certify a passable deep probe (N.T. 261) and despite his conclusion that the ground suitability for the proposed system was marginal, he assisted Paul Geyer in pursuing the permit (N.T. 266-267).

10. On January 23, 1981, before receiving a permit for a sewage disposal system, the Geyers made settlement for the mobile home park with the Roths (N.T. 288). The reasons for making settlement before receiving the permit were the urging of the sellers (N.T. 322) and the possibility of losing the mortgage commitment (N.T. 321).

11. While the Geyers may have believed that a permit would . . . be issued because of passable deep probes (N.T. 322), at the time they purchased the mobile home property on January 23, 1981, the plans for the now malfunctioning pressure dose elevated sand mound system had not been submitted to DER for approval (N.T. 136). The first meeting between the Geyers and DER did not occur until February or March 1981 (N.T. 262, 123, 174).

12. At no time did anyone from DER or the Township ever represent to the Geyers that the proposed system would not malfunction or did anyone from DER, as alleged by Geyers, ever tell Geyers that if water ran out of the system it would be sufficiently purified and of no consequence (N.T. 180, 181-182, 360-361).

13. It was always Paul Geyer's intention to utilize a sand mound system (N.T. 343); first proposing a standard elevated sand mound in December 1980, a standard mound system with aerobic tank in March 1981, and an experimental pressure dose system in June (N.T. 136-137). Geyer learned about the pressure system before his meeting with DER (N.T. 343).

14. Steven Geyer designed a pressure dose elevated sand mound system according to standards for such a system then being pro-

posed, but not yet adopted for a revision of Chapter 73 of DER Regulations (N.T. 177-178, 184). By letter dated July 1, 1981, DER approved the design as meeting the criteria in the proposed revision of Chapter 73 (Plaintiff's Exhibit 10), and on July 13, 1981, the Township issued a permit to Geyers for the installation as an experimental system (Plaintiff's Exhibit 9).

15. Paul Geyer received a copy of the DER letter of July 1, 1981 which expressly informed him that in the event of a malfunction, he was responsible for corrections or replacement of the system (Plaintiff's Exhibit 10, N.T. 326).

16. The proposed system was experimental to determine whether pressure dose elevated sand mound systems would work (N.T. 141, 370) and to help Geyer repair a malfunction (N.T. 368, 193-195).

17. DER supplied Geyer with the proposed regulations for the pressure dose system, a manual describing the design (N.T. 184) and twice explained to him how to build the system, including a slide presentation (N.T. 179). Geyer violated proper construction procedures by keying in the berm (N.T. 179, 185-187), and compacting the absorption area with heavy equipment (N.T. 89, 101-102, 120).

18. The system was completed by Geyer on December 1981 (N.T. 299) but an inspection on September 7, 1983 revealed that sewage was seeping through the berm on one of the sand mounds (N.T. 26, Plaintiff's Exhibit 11) and the condition has been continuous to date (N.T. 129 and other references).

19. The malfunctioning of the system cannot be attributed to a single factor (N.T. 198). Un-

suitable soil is one probable cause (N.T. 241), but other factors may be involved including poor construction methods (198, 241, 148), poor plumbing in the mobile home park water system (N.T. 198), and a spring (N.T. 330, 335; Plaintiff's Exhibit 12).

20. The Geyers have been directed to correct the malfunctioning system but have not done so (N.T. 26-31).

*Londonderry,* 107 Dauph. at 70-73.

Appellants' objections to the chancellor's adjudication are primarily directed to what Appellants believe the findings of fact should have been. Appellants point to evidence and testimony which they feel would support a conclusion that the Township, DER, and Ferree acted improperly and that Appellants relied to their detriment on these improper actions in deciding to purchase the park and install the system. Appellants contend these conclusions would establish a vested right in the permit[16] which would entitle them to the relief they claim.

Appellants misunderstand our scope of review on appeal from a chancellor's adjudication. This court, as previously stated, is limited to determining whether the chancellor's findings of fact are supported by substantial evidence, an error of law has been made or whether the chancellor abused his discretion. *Millstone Enterprises.*

---

[16] A vested right to a sewage permit will be recognized: Where the landowner has no means by which he could determine that a sewer permit was improperly issued, where he obtained the permit and used it in good faith and where he relied upon the permit and made a large financial investment based upon its validity, then the owner does acquire a vested right in a municipal permit. *Turner v. Martz,* 42 Pa. Commonwealth Ct. 328, 332, 401 A.2d 585, 587 (1979).

We may not review the evidence and make our own factual findings; we are limited solely to reviewing the record to determine if it contains substantial evidence to support the chancellor's factual findings. The presence of evidence contrary to the chancellor's findings does not make them unsupported as issues of credibility and evidentiary weight are within the exclusive province of the chancellor. *Babin v. City of Lancaster,* 89 Pa. Commonwealth Ct. 527, 493 A.2d 141 (1985).

Appellants specifically take issue with findings of fact 5 and 16. They contend that finding of fact 5 is incorrect in stating that "suitability required only one deep probe . . . establishing at least a twenty (20) inch limiting zone" because "the undisputed testimony and the regulations relating to elevated sand mound systems requires that the depth of suitable soil under the elevated sand mound portion of the seepage bed must, at a minimum, be 20 inches." Appellants' brief at 13. Appellants are correct that the testimony and the regulations do require a 20 inch depth under the entire bed. However, as Kenneth Witmer, Township alternate sewage enforcement officer, testified:

> At that time [when the test was done on Appellants' property], the operations were handled in a manner [that] if you found a deep probe that was suitable, it was acceptable. Today's present procedures are a little different in that you may have to do more than one probe in the area and approve the entire bed area of being within the twenty inches. That was not the manner at the time.

N.T. at 37. This testimony provides substantial support for the chancellor's finding that in 1980 one deep probe showing a limiting zone of twenty inches was sufficient to establish the suitability of the bed on an application for a sewage disposal permit.

Appellant's objection to finding of fact 16 is to the term "experimental." They claim that their permit was improperly labeled an "experimental" permit because the regulations defined an experimental system as one "proposed for use for the purpose of testing and observation," 25 Pa. Code §71.1. Appellants argue that because DER had proposed the regulation on which the plans for the sewage disposal system were based, that system "was no longer in the experimental phase and there was no experimental purpose for the regulation." Appellant's brief at 21. However, as Ferree testified: "We were . . . allowing these systems to be permitted to provide evidence that this type of system worked." N.T. at 141. This is substantial evidence to support the finding that the system was experimental.

Our review of the record shows substantial evidence for all of the chancellor's other findings of fact as well. We conclude that these findings support a conclusion that Appellants alone are responsible for the malfunctioning system and that the permit was not issued nor the system approved in violation of the Act or any regulations. Therefore, we do not reach Appellants' vested right contention.

## EQUITABLE ESTOPPEL

Appellants' equitable estoppel defense is based on the "clean hands" doctrine. "The bar of unclean hands is applicable in Pennsylvania only where the wrongdoing of the plaintiff directly affects the equitable relationship subsisting between the parties and is directly connected with the matter in controversy." *Stauffer v. Stauffer*, 465 Pa. 558, 575, 351 A.2d 236, 244 (1976). Appellants' contention that they are entitled to this defense is premised on their assertion that the Township's actions in issuing the permit and approving the system were wrongful. Because we have concluded that the findings

of fact will not support such a conclusion, Appellants may not avail themselves of this defense. *See Millstone Enterprises.*

Accordingly, the order of the Court of Common Pleas of Dauphin County is affirmed.

ORDER

AND NOW, January 29, 1988, the order of the Court of Common Pleas of Dauphin County in the above-captioned case is affirmed.