**Estate of Ferrell**

C.P. of Philadelphia County, O.C. no. 550 of 1994.

*Paul L. Herron,* for accountant.
*Jeffrey Freedman,* for objectant.

*EN BANC,* O'BRIEN, PAWELEC, *JJ.,* concurring in result; LEWIS, *J.,* dissenting, September 12, 1996—

## PROCEDURAL HISTORY AND DECISION BY THE AUDITING JUDGE AND THE COURT EN BANC

This litigation arises out of an objection by Patrick Legradi to the account of Donna Ferrell, administratrix of the estate of their deceased child, David Ferrell, born out of wedlock on April 23, 1983 and dying that same day just eight hours into his life. The auditing judge presided at an evidentiary hearing on April 26, 1995 and issued an opinion and adjudication on August 24, 1995 sustaining the objection of Legradi and allowing him an intestate share in the estate of the decedent.

Both the administratrix and Legradi filed exceptions to the adjudication in regard to the division of the funds obtained in the civil litigation and argument was held thereafter before the court en banc.

The procedural history and the evidence presented on behalf of the administratrix, Donna Ferrell, and the exceptant, Patrick Legradi, are accurately stated in the adjudication.

The findings of fact by the chancellor are fully supported in the record which consists of the stipulation of the parties and the testimony of the parties and witnesses.

The findings are adopted by the court en banc. However, considerations of the effect of abandonment in the law and principles of equity referenced herein by the court en banc require a reversal of decision of the chancellor and the denial of the claim of Patrick Legradi for an intestate share of the estate of the decedent.

## FACTUAL HISTORY

Donna Ferrell, at the time of conception of the decedent, was a single, unemployed, 21-year-old woman. (N.T., p. 4.)

Patrick Legradi was at the same time married with one daughter, age 5, born of his marriage. (N.T., pp. 12, 13.) He "dated" (N.T., pp. 9, 10) Donna Ferrell daily over a period of three months during which they were frequently intimate. (N.T., p. 14.)

At the time of their relationship, Donna was living in the home of her parents and several siblings and was solely supported by her parents. (N.T., p. 4.)

The parties stipulated on the record that Patrick Legradi terminated the relationship between them and that Donna Ferrell was pregnant as a result of sexual intercourse with Legradi. *Id.* The latter circumstance was confirmed when Donna saw her physician on or about November 3, 1982 and a routine pregnancy test proved to be positive. (N.T., pp. 4, 15.)

Donna communicated with Legradi by phone and informed him that their intimacy had resulted in her pregnancy. (N.T., pp. 15, 16.) Legradi's reply was terse and unequivocal: he told Donna to get an abortion. She testified that he said, "I was on my own and not to bother him." (N.T., p. 16.)

Donna's response to Legradi's order to abort the child was: "I told him I wasn't going to kill my baby." (N.T., p. 16.)

Donna continued to phone Legradi but he rebuffed her appeal for aid with the admonishment: "Don't bother me; why are you bothering me?" (N.T., pp. 17-18, 25 and 42.)

At the hearing, Donna explained her purpose in phoning Legradi: "I just wanted him to help me financially. I had no job. He knew I had no job. I wanted some financial help and I wanted him to be there for the baby. The baby had a right to have a father. I wanted him to take part in the baby's life." (N.T., p. 18.)

Donna testified that she phoned Legradi over a three-month period and that she had written a letter addressed to Legradi at his home pleading for financial assistance and participation in the baby's life. (N.T., pp. 18-20, 23-24.)

Donna spoke by phone to Legradi relative to the letter which the latter acknowledged receiving by telling her: "There's nothing of importance in that letter." (N.T., p. 20.) She testified that: "He told me to stop bothering him and he ripped the letter up." (N.T., p. 20.)

Donna was driven by a friend to Legradi's home on occasions to discuss her plight. During one of these attempts to meet Legradi, the latter saw her and "jumped in his truck and took off" when she approached him and was about 30 feet away. (N.T., p. 21.) On another occasion, Donna saw Legradi sitting in a police vehicle and he immediately drove away when he saw her. (N.T., p. 22.)

Denied any financial support from Legradi and having limited resources of her own, Donna received public medical assistance and aid from her mother during the pregnancy. (N.T., p. 23.)

Having been repeatedly rebuffed by Legradi, Donna made no further attempts to ask him for financial help during the balance of the pregnancy, and none was ever offered or provided. (N.T., p. 24.)

The child, named David, was born prematurely on April 23, 1983 and passed away shortly thereafter. (N.T., pp. 4-5, 24.) A civil action was commenced by Donna as administratrix of the estate of her child on the basis of medical malpractice and there was a jury verdict and award, augmented by delay damages, in the total sum of $625,000. (N.T., p. 5.)

Legradi now seeks "his share" of the money on the award from the civil action for the death of his son. It is the one and only interest that he has shown in his child over a period of 12 years. (N.T., p. 41.) Up

until this point, Legradi's actions and words were all consistent with his initial rejection of the child and denial of assistance to the mother.

Legradi took the stand and either denied that he refused to give financial support for the birth of the child or he could not recall those incidents and statements relating to abortion or refusal to give the aid as recited by Donna in her testimony. (N.T., pp. 68-69.) Legradi claims that after being told by Donna in a phone call sometime in late October or early November 1982 that she was pregnant, he phoned her home "about a month later" and Diane, a sister of Donna, answered and after a long wait told him: "that Donna wasn't there right now." (N.T., p. 67.) He made no other phone calls and he only remembered this one after his deposition had been taken by the lawyer for the administratrix. At the deposition, he failed to mention this solitary attempt to speak with Donna. (N.T., pp. 85-86.)

Legradi confirmed in his testimony that he made no further effort to communicate with Donna, her family or mutual friends respecting her pregnancy and the birth of decedent. (N.T., pp. 69, 74-76.)

The chancellor at the evidentiary hearing narrowed the objections to no. 1: "The objectant is the father of the decedent, and by reason thereof is entitled to a one-half share in the decedent's estate." (N.T., p. 93.)

The testimony of the mother of the deceased child, David, was summarized and accepted as the facts worthy of belief while the chancellor expressed doubt at the belated claim by Legradi that he made one unsuccessful phone call to Donna during her pregnancy. (Adjudi-

cation, p. 3): "This alleged effort to contact Donna Ferrell is totally inconsistent with Patrick Legradi's actions. . . . The undersigned found Patrick Legradi's testimony to be totally lacking in credibility." The issue of credibility and the findings of fact are matters within the exclusive authority of the auditing judge. They will not be disturbed by the court en banc which only must determine whether findings are based on the record of the testimony offered at the trial and the evidence is not interpreted in an unreasonable or mistaken manner. *In re Estate of Dembiec,* 321 Pa. Super. 515, 468 A.2d 1107 (1983); *Masciantoni Will,* 392 Pa. 362, 141 A.2d 362 (1958). The chancellor's findings pass these tests.

## DISCUSSION OF LAW

The court en banc arrives at a conclusion which differs from that of the chancellor upon a consideration of the applicable law relating to abandonment and the request by Legradi for equitable relief.

It is generally correct to state that forfeitures are not favored in the law and that the statute referred to, viz., 20 Pa.C.S. §2106(b), does not defeat Legradi's claim since the lapse of time requirement for desertion is not satisfied. Further, 20 Pa.C.S. §2106(b) does not apply since it became effective March 7, 1984, subsequent to the birth of the deceased child of the parties.

However, abandonment, sometimes referred to as desertion or relinquishment, exists as a legal concept. It is frequently recognized in the law and clearly applies in this case. In fact, the P.E.F. Code itself recognizes abandonment in regard to assets which various fiduciaries may decline to administer; 20 Pa.C.S. §3312

(personal representatives), section 5143 (guardians of a minor), section 5521 (guardians of an incapacitated person), and section 7132 (trustees).

Abandonment is also recognized in regard to the termination of parental rights in order that an adoption of a child may go forward. The grounds for abandonment in this latter situation are fairly simple—the failure of the parent to provide financial support and to have any contact with the child for a six-month period. 23 Pa.C.S. §2511(a)(1); *Adoption of M.S.,* 445 Pa. Super. 177, 664 A.2d 1370 (1995); *Adoption of Meyers,* 29 Northumb. L.J. 167 (1957); *Adoption of Wuagon,* 47 Lacka. Jur. 109 (1947); see generally, Homer H. Clark Jr., *The Law of Domestic Relations in the United States* §217 (1987).

Furthermore, on analysis, 20 Pa.C.S. §2106(b) merely formalizes one method of terminating the interest of a parent in a child and the estate of a child. Other methods exist as well.

Perhaps the clearest instance of an abandonment by a parent is the case of a mother submitting to an abortion of her child. The infliction of death is absolute and irrevocable—a direct method reserved by nature for the parent carrying the child.

Legradi elected to abandon the child by urging the mother to have an abortion and reinforced his wish by ignoring repeated pleas for financial aid for medical care during the pregnancy and at the birth of the child. This was Legradi's unequivocal declaration by word and deed to abandon his child. If the child had lived, society might require the father to provide financial support for the child which he and the mother conceived,

but society could never, in a practical way, require him to accept the role of a caring, supportive parent in nurturing a human being into maturity and self-sufficiency. Since the role set down by nature for a parent may be repudiated by abandonment, there appears no legal or rational basis to reserve to the abandoning parent an interest in the estate of the child.

The methods of abandonment of children are found in various statutes and court-supervised procedures. Abandonment may be implemented by way of a petition or written agreement or definitive behavior such as desertion or failure to perform a duty of support. *Commonwealth ex rel. Kraus v. Kraus,* 185 Pa. Super. 167, 138 A.2d 225 (1958). The absence of any act of support for a child is deemed in itself to constitute abandonment of parental rights. The act of abandonment is not only defined and formalized by statute, but there is recognized in case law abandonment by an indifference to some recognized social or moral obligation and which operates to relinquish rights and interest in a person and property. *Auman v. Eash,* 228 Pa. Super. 242, 323 A.2d 94 (1974).

In the case at bar, Legradi did not exercise his right to abandon his interest in his son and his property by filing a petition with the appropriate court having jurisdiction or by signing an agreement to memorialize his rejection of the decedent. Legradi chose rather to turn the expectant mother out in a symbolic gesture to fend for herself in carrying the child to birth. He scoffed at her pleas for financial assistance incidental to the birth of the decedent. He preferred to deal with this child which he brought into being as the state deals with a convicted felon found guilty of a capital crime; he ordered the mother to put the child to death.

Legradi's repeated refusal to give aid to the decedent prior to birth and his complete indifference to the possible existence of the child for 12 years demonstrates that Legradi chose not to be a father and elected to be free of any obligation that that status entails.

Having exhibited a clear and consistent abandonment of any interest or claim to the decedent, it follows that Legradi is applying to this court to absolve him from the consequences of his own decision to abandon his interest in the decedent and the estate of the decedent.

The circumstances of this case, however, have radically changed since Legradi made his initial decision of rejection of fatherhood.

The mother of the decedent no longer seeks financial assistance nor the emotional support for her pregnancy and the child no longer has need of any financial support. Indeed, Legradi finds himself comfortably situated astride the best of both worlds—free from any responsibility toward the mother and their child on one hand and, on the other, expectation of gain derived from the death of the child he abandoned.

The self-indulgent, cynical conduct of Patrick Legradi toward Donna and the decedent shocks the conscience of this court and his appeal for relief from the effect of his abandonment of the decedent finds no favor before the court en banc.

It is at the very heart of equity: that one may claim a relief or a remedy in equity only when he comes with clean hands.

Traditionally, equity will not grant relief where an applicant has unclean hands. Legradi's hands initially stained with adulterous behavior, are now extended,

newly tainted with avarice and grasping for money derived from Donna's ordeal in giving life to David, their child, and enduring his death alone.

Consider, the situation of Legradi: a married man, with a child born of that subsisting marriage, a uniformed policeman for approximately five years, engaged in sexual intercourse with a young woman, one year out of high school and approximately eight years his junior. Legradi was not free to marry and pursued his relationship with Donna solely to satisfy his lust "almost every day" for a period of five or six weeks. His purpose was completely self-indulgent. He obviously did not intend to create a traditional family of parents, and child, although his conduct indicated that such a situation was in the offing.

Legradi's behavior has changed from lust to greed with a cynical agility that shocks the conscience of the court; indeed, any conscience which is not dead to decency and respect for human life.

Legradi's evident motivation was to take from this woman her trust and virtue; and then slip away from any responsibility without regard to the conception of a new person and his duty to that person's mother. According to Legradi, he phoned Donna after numerous dates to tell her that he didn't think they were "compatible," a most peculiar afterthought under the circumstances. (N.T., p. 66.) More likely, this father of three children by three different women (other than Donna) had found a new interest. In any event, he appears wholly indifferent to the consequences of his adulterous relationship with the decedent's mother.

The Supreme Court of Pennsylvania, speaking through Justice Hutchinson, underscored the authority of the Orphans' Court in granting equitable relief in *In re Estate of Pedrick,* 505 Pa. 530, 482 A.2d 215, (1984):

"In the exercise of the limited jurisdiction conferred on it by statute, it is plain that the Orphans' Court must apply the rules and principles of equity. *Estate of Hahn,* 471 Pa. 249, 369 A.2d 1290 (1977); *Estate of Freihofer,* 405 Pa. 165, 174 A.2d 282 (1961); *Re Douglas' Estate,* 303 Pa. 227, 154 A. 376 (1931). Thus, the familiar equity maxim 'he who comes into a court of equity must come with clean hands' applies to matters within the Orphans' Court's jurisdiction. *Re Cross' Estate,* 319 Pa. 1, 179 A. 38 (1935); *Re Hays' Estate,* 159 Pa. 381, 28 A. 158 (1893). See also, *Weber Estate,* 15 Fid.Rep. 464, 57 Berks 163 (1965).

"The maxim itself is derived from the unwillingness of a court to give relief to a suitor who has so conducted himself as to shock the moral sensibilities of the judge, and it has nothing to do with the rights or liabilities of the parties. Public policy not only makes it obligatory for the court to deny relief, once a party's unclean hands are established, but to refuse the case. *Gaudiosi v. Mellon,* 269 F.2d 873, 881 (3d Cir.), *cert. denied,* 361 U.S. 902, 80 S.Ct. 211, 4 L.Ed.2d 157 (1959)." *Id.* at 543-44, 482 A.2d at 222. (footnote omitted)

The court went on to state:

"Thus, the clean hands doctrine does not bar relief to a party merely because his conduct in general has been shown not to be blameless; the doctrine only applies where the wrongdoing directly affects the relationship subsisting between the parties and is directly connected with the matter in controversy. *Stauffer v.*

*Stauffer,* 465 Pa. 558, 351 A.2d 236 (1976) (opinion by Eagen, J.); *Spring City Foundry Co. v. Carey,* 434 Pa. 193, 252 A.2d 666 (1969); *Shapiro v. Shapiro,* 415 Pa. 503, 204 A.2d 266 (1964); *McLaughlin v. McLaughlin,* 410 Pa. 1, 187 A.2d 905 (1963)." *Id.* at 545, 482 A.2d at 222-23.

Surely, equity in its origin and its history never yielded assistance to an appeal as brazen as this one, made without regret or shame. If the applicant for relief has no conscience, the court must be guided by its own in rejecting this claim. This court may raise (and chooses to do so) the doctrine of "clean hands" sua sponte, since its equitable powers are so clearly involved in the remedy which is being pursued, irrespective of whether or not the matter was placed in issue by the parties.

## CONCLUSION

The exceptions by the administratrix to the adjudication are sustained. The exceptions by Patrick Legradi to the adjudication are dismissed. The objection of Legradi to the account of the administratrix is dismissed. Pawelec, J. concurs in the result. Lewis, J. dissents to the decree and opinion.

## DECREE

And now, September 12, 1996, it is decreed that the objection of the respondent, Patrick Legradi, to the account of the administratrix, Donna Ferrell, and the exceptions of Patrick Legradi to the adjudication of Lewis, J. are dismissed and the exceptions of Donna Ferrell to the adjudication of Lewis, J. are sustained.