# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

City of Lebanon, Jonestown Borough, :
North Cornwall Township, North :
Lebanon Township, North Londonderry :
Township, Northern Lebanon School :
District, Palmyra Area School District, :
South Lebanon Township, South :
Londonderry Township, Swatara :
Township, Union Township, and West :
Lebanon Township :
                                     :
              v.                     :
                                     :
Cornwall Borough, Heidelberg         :
Township, North Annville Township,   :
West Cornwall Township, and          :
Bethel Township                      :
                                     :
              v.                     :
                                     :
Lebanon County Earned Income Tax     :
Bureau                               :
                                     :
Appeal of: Cornwall Borough,         :
Heidelberg Township, West Cornwall   :   No. 2419 C.D. 2015
Township, and Bethel Township        :   Argued: September 13, 2016


BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
          HONORABLE P. KEVIN BROBSON, Judge (P.)
          HONORABLE ANNE E. COVEY, Judge


OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                          FILED: October 6, 2016


          Cornwall Borough, Heidelberg Township, West Cornwall Township and

Bethel Township (collectively, Appellant Municipalities)[1] appeal from the judgment

---

[1] North Annville Township did not participate in this appeal.

entered on November 9, 2015 in favor of Appellees City of Lebanon, Jonestown Borough, North Cornwall Township, North Lebanon Township, North Londonderry Township, Northern Lebanon School District, Palmyra Area School District, South Lebanon Township, South Londonderry Township, Swatara Township, Union Township, and West Lebanon Township (collectively, Appellee Municipalities) and the judgment entered on November 19, 2015 in favor of Appellant Municipalities against the Lebanon County Earned Income Tax Bureau (Bureau),[2] following the Lebanon County Common Pleas Court's (trial court) October 30, 2015 order denying Appellant Municipalities' Motion for Post Trial Relief.[3] There are four issues before this Court: (1) whether the trial court improperly relieved Appellee Municipalities of their burden of proof and erroneously relied upon flawed data and imprecise estimates; (2) whether the trial court erred by awarding pre-judgment interest to Appellee Municipalities at a 6% interest rate; (3) whether the trial court erred by failing to award Appellant Municipalities recovery against the Bureau for the costs Appellant Municipalities will be required to pay back to Appellee Municipalities; and, (4) whether the trial court failed to properly apply general equitable principles. After review, we affirm.

In 1967, the six Lebanon County School Districts created the Bureau pursuant to the Local Tax Enabling Act[4] (LTEA) to collect and distribute earned income tax payments for its six member school districts. Thereafter, all twenty–six Lebanon County municipalities that levied an earned income tax used the Bureau for such services. The Bureau was governed by a six-person Executive Committee

---

[2] Appellant Municipalities appeal from the judgment entered in their favor because they contend that the damages awarded against the Bureau were inadequate.

[3] "[A]n appeal properly lies from the entry of judgment, not from the denial of post-trial motions." *Gold v. Rosen*, 135 A.3d 1039, 1040 n.1 (Pa. Super. 2016).

[4] Act of December 31, 1965, P.L. 1257, *as amended*, 53 P.S. §§ 6924.101–6924.901.

(Executive Committee), comprised of one representative from each of the six school districts.

The Bureau's Executive Director Donald Foltz, Jr. (Foltz) managed the Bureau's banking activities and possessed the authority to write checks on the Bureau's behalf. Additionally, at Foltz's direction, the Bureau implemented a system to distribute earned income tax revenues to member school districts and municipalities.

In 2006, the Bureau's Executive Committee investigated the Bureau's operations, and retained the Boyer & Ritter accounting firm to review the Bureau's accounting procedures and internal controls. Based upon deficiencies identified by Boyer & Ritter in a report issued on March 7, 2007, Foltz was placed on administrative leave that day. On March 14, 2007, Foltz's employment was terminated.

Shortly thereafter, the Bureau discovered that, between 2002 and 2006, Foltz deposited $895,676.15 of tax revenues into an account for his personal use, and wrote checks from that account to himself in an amount totaling $811,000.00. The Bureau recovered $80,409.30 in remaining funds from the account. On March 30, 2007, Foltz committed suicide. The Bureau's insurer reimbursed the Bureau for the $811,000.00 theft by Foltz, less a $10,000.00 deductible.

In March 2007, the Bureau engaged certified public accountant Nancy Moran (Moran) to serve as the Bureau's Interim Executive Director. Moran found the Bureau's operations in complete disarray. She observed that some employees were using Xerox boxes as work space, and discovered that the Bureau's computer system was an antiquated DOS-based system. She further learned that Foltz had paid some employees extra-payroll compensation. In addition, she uncovered that Foltz had not paid distributions to out-of-county tax bureaus for non-resident tax income

3

that the Bureau had collected on their behalf. Thus, the Bureau owed $1.95 million to out-of-county governmental entities as of November 2007.

On December 18, 2007, Moran issued a public report containing preliminary concerns she and the Bureau staff identified regarding quarterly earned income tax revenue distributions to school districts and municipalities between 2004 and 2007. Specifically, Moran was worried that the Bureau's computer system was "hard-wired" with incorrect percentages that were used to calculate distribution reports. In addition, Moran believed that Foltz had made "round number" adjustments to distributions. Finally, Moran suspected that the Bureau's computer system did not correctly calculate shared income tax revenue in instances where particular municipalities and school districts did not equally split that tax revenue. Moran emphasized that these concerns were based upon preliminary information then-available, and that further investigation would be required.

In response to Moran's public report, the Lebanon County school districts and municipalities all agreed that a more detailed investigation should be conducted to determine the extent of the alleged overpayments and underpayments from 2004 through 2007. In July 2008, at the behest of the Lebanon County school districts and municipalities, including all parties to the instant litigation, the Bureau engaged the accounting firm of McKonly & Asbury, LLP (M&A) to investigate and report on the Bureau's overpayments and underpayments from 2004 through 2007.

Because the Bureau did not possess adequate and accurate records of individual taxpayer tax payments for the relevant years, M&A was unable to recreate the necessary tax data using Bureau records alone. Information relating to income tax returns - including the returns themselves and supporting detail, such as W-2 forms or employer reconciliations - did not exist in the Bureau's records; and, employer submissions were incomplete, lacking the individual-level data that was supposed to

accompany quarterly and/or end-of-the-year tax payments.[5] While it was standard protocol for the Bureau's clerks to send deficiency letters to employers, deficiencies were frequently not cured because employee-level detail was not provided and, thus, never entered into the Bureau's computer system.[6]

M&A obtained the Department of Revenue PA-40 (PA-40) data for each of the Lebanon County school districts, which identified taxpayers by name and social security numbers, and also identified their annual compensation as reported to the Commonwealth. However, the PA-40 data included income reported to the Commonwealth that is not taxable for earned income tax purposes.

Beginning in the third quarter of 2008, all Lebanon County school districts and municipalities agreed that the Bureau should contract Keystone Collections Group (Keystone) to take over the collection and disbursement of Lebanon County earned income taxes. Pursuant to its contract with the Bureau, Keystone collected taxes for the Lebanon County school districts and municipalities through the end of 2009.[7]

---

[5] Under Foltz's direction, files and documents were untidy, disorganized and sometimes missing. Bureau employee Lynn Ratcliffe (Ratcliffe) observed what she believed was the shredding of 2006 earned income tax records. On Moran's March 2007 visit to the Bureau's office, she observed multiple black trash bags containing shredded documents, and trays, copier paper boxes and trash bags containing tax returns and census mailings from prior years addressed to Lebanon County residents that the Bureau had never sent. On occasion, Bureau employees encountered situations where the Bureau's records showed that earned income tax payments had not been made, but the taxpayers reported making payments and their checks had cleared. Further, Ratcliffe recalled that, at times during Foltz's tenure, the Bureau did not enter into the computer employee-level detail employers submitted, or it was entered and later deleted and the hard copies were destroyed.

[6] The Bureau's computer maintained a Lebanon County taxpayer roll by tax year that identified taxpayers by their social security numbers and municipalities. Bureau employees regularly updated the taxpayer roll based on information taxpayers submitted with their earned income tax returns. The taxpayer roll was also updated regularly based on information taxpayers submitted with their per capita taxes and real estate taxes.

[7] As a result of Act 32 of 2008, effective January 1, 2010, the collection of earned income taxes within Lebanon County became the responsibility of the Lebanon County Tax Collection Committee (the TCC), and the Bureau no longer was responsible for such collection. Keystone

M&A provided its initial report on January 22, 2009; however, the initial report did not include any data for 2007. In October 2009, all Lebanon County school districts and municipalities, including the parties to this litigation, directed the Bureau to engage M&A to provide an updated analysis of the payments made by the Bureau from 2004 through 2006, as well as 2007. M&A issued an updated report on March 17, 2010 (M&A Report). The M&A Report relied on the Bureau's taxpayer roll, and the PA-40 data M&A had obtained.

According to the M&A Report, the following school districts and municipalities were **underpaid** from 2004 through 2007: Annville Township $11,996.40; City of Lebanon $1,447,958.54; Jonestown Borough $166,503.09; North Cornwall Township $315,164.25; North Lebanon Township $822,264.07; North Londonderry Township $587,268.05; Northern Lebanon School District $107,236.24; Palmyra Area School District $859,018.57; South Lebanon Township $459,635.34; South Londonderry Township $529,205.07; Swatara Township $166,457.74; Union Township $159,455.69; and West Lebanon Township $62,135.66.

The M&A Report also found that other school districts and municipalities had been **overpaid** from 2004 through 2007, as follows: Annville-Cleona School District $500,523.00; **Bethel Township $70,571.51**; Cleona Borough $43,806.82; **Cornwall Borough $1,056,677.45**; Cornwall-Lebanon School District $384,926.28; East Hanover Township $186,941.80; Eastern Lebanon County School District $1,171,005.50; **Heidelberg Township $766,830.89**; Jackson Township $47,838.69; Lebanon School District $326,089.11; Millcreek Township $941.76; Mt. Gretna Borough $219,053.91; Myerstown Borough $44,387.37; **North Annville Township $275,413.94**; Palmyra Borough $129,669.20; Richland Borough

continued collecting earned income taxes for the Lebanon County political subdivision after January 1, 2010, pursuant to an appointment by the TCC.

$26,312.78; South Annville Township $313,720.28; and **West Cornwall Township $129,588.44**.

Thirteen of the 18 overpaid political subdivisions agreed to return the overpayments, and were permitted to make repayments over time without interest pursuant to a voluntary settlement known as the "Grumbine Plan." Appellant Municipalities refused to return the overpayments identified in the M&A Report.

On June 20, 2012, Appellee Municipalities filed an action against Appellant Municipalities alleging violations of the LTEA, unjust enrichment, constructive trust and conversion. The Honorable Bradford H. Charles held a four-day bench trial. The parties stipulated to many of the facts, and the trial focused primarily on the M&A Report's reliability and accuracy. Both Appellant Municipalities and Appellee Municipalities presented expert testimony and reports, and limited factual testimony. The trial court appointed a forensic accountant to conduct an independent analysis and critique the methodology applied in the M&A Report.

On July 15, 2015, the trial court issued a thorough, well-reasoned and well-written 75-page Adjudication and Opinion (July 15, 2015 Opinion), clearly laying out the complex factual history and fully explaining the trial court's legal reasoning. The trial court ruled in favor of Appellee Municipalities on their unjust enrichment, constructive trust and LTEA claims, and in Appellant Municipalities' favor on their claims against the Bureau. The trial court directed Appellant Municipalities to return the Bureau's overpayments as calculated in the M&A Report, and, on September 25, 2015, after a subsequent hearing, awarded Appellant Municipalities pre-litigation fees and expenses as against the Bureau.

On October 5, 2015, Appellant Municipalities filed a motion for post-trial relief which the trial court denied by October 30, 2015 opinion and order

(October 30, 2015 Opinion).[8]  Appellee Municipalities and Appellant Municipalities filed praecipes for entry of judgment.  On November 9, 2015 and November 19, 2015, the trial court entered the judgments.  Appellant Municipalities appealed to this Court.[9]

Appellant Municipalities first argue that Appellee Municipalities failed to meet their burden of proof in establishing their damages, and that the trial court improperly shifted the burden of proof.  We disagree.

Appellee Municipalities presented significant expert testimony to establish their right to recovery.  In a 12-page discussion in its July 15, 2015 Opinion, the trial court addressed the evidence and its consideration thereof, described its rationale for accepting the M&A Report's analysis, and referenced the testimony of M&A's principal Samuel Bowercraft (Bowercraft).[10]

"As the finder of fact, the trial court has exclusive authority to weigh the evidence, make credibility determinations and draw reasonable inferences from the evidence presented."  *Barylak v. Montgomery Cnty. Tax Claim Bureau*, 74 A.3d 414, 417 (Pa. Cmwlth. 2013).  This Court "may not reweigh the evidence and substitute our judgment for that of the fact-finder."  *Swift v. Dep't of Transp.*, 937 A.2d 1162, 1167 n.5 (Pa. Cmwlth. 2007).

---

[8] Notably, the trial court's October 30, 2015 Opinion individually addressed the same issues currently before this Court.  It discussed and dismissed each argument by referencing specific portions of its July 15, 2015 Opinion.

[9] This Court has explained:

> Our standard of review of a non-jury trial is to determine whether the findings of the trial court are supported by competent evidence, and whether an error of law was committed.  In reviewing this matter, our court may not reweigh the evidence and substitute our judgment for that of the fact-finder.  A challenge to the sufficiency of the evidence is a question of law requiring a plenary scope of review.

*Swift v. Dep't of Transp.*, 937 A.2d 1162, 1167 n.5 (Pa. Cmwlth. 2007) (citations omitted).

[10] Bowercraft was primarily responsible for developing the M&A Report.

8

Here, relative to Bowercraft, the trial court specifically stated:

> For nearly one full day, we listened to Bowercraft testify about his methodology. In the process, we watched Bowercraft respond to the criticisms hurled by [Appellant Municipalities]. The more we listened to Bowercraft's testimony, the more we were impressed by his grasp of data analytics and the application of his expertise to the difficult assignment of reconstructing how taxes should have been distributed in Lebanon County between 2004 and 2007. The bottom line is that **we found Bowercraft's testimony to be credible**.

July 15, 2015 Op. at 35 (emphasis added). The trial court further explained:

> Perhaps more important than any other factor, we have been given information that would enable us to 'test' the M&A analysis by comparing it with what everyone has agreed is accurate data created by Keystone. Specifically, we have been given Keystone's actual distribution figures for the years 2009 through 2012. **Because no one has questioned the accuracy of Keystone's data analytics, we view the Keystone distributions between 2009 and 2012 to be the 'gold standard' by which earned income tax should be distributed in Lebanon County**. This conclusion is bolstered by the fact that [both parties' experts, and the court appointed forensic accountant] all relied upon the Keystone data in one way or another[.]

*Id*. at 38 (emphasis added). We will not disturb these findings. With respect to the certainty of damages, we find that the trial court's legal analysis is sound. As this Court held in *Merrell v. Chartiers Valley School District*, 51 A.3d 286 (Pa. Cmwlth. 2012):

> [M]ere uncertainty as to the amount of damages will not bar recovery where it is clear that damages were the certain result of the defendant's conduct. . . . The basis for this rule is that the breaching party should not be allowed to shift the loss to the injured party when, damages, even if uncertain in amount,

9

> were certainly the responsibility of the party in breach.
>
> *Spang & Co.* [*v. United States Steel, Co.*], . . . 545 A.2d [861,] 866 ([Pa.] 1988) [(quoting *Pugh v. Holmes*, . . . 405 A.2d 897, 910 ([Pa.] 1979))]. If the evidence provides a reasonably fair basis for calculating damages, it is legally sufficient to support an award of damages.

*Merrell*, 51 A.3d at 299.[11]

Because the Court agrees with the trial court's in-depth discussion and analysis of the evidence, we adopt the trial court's opinion as it pertains to the sufficiency of Appellee Municipalities' evidence in meeting their burden of proof and establishing their damages. Accordingly, we conclude that Appellant Municipalities' argument is without merit.

With respect to Appellant Municipalities' argument that the trial court improperly shifted the burden of proof, the trial court explained in its October 30, 2015 Opinion:

---

[11] This Court previously explained:

> The question of the sufficiency of evidence to establish damages has been considered in various contexts and almost without exception it has been held that although 'guesses' and 'mere speculations' are not permitted, **'estimates' which have a basis in reason are legally sufficient.** *See Smail v. Flock*, . . . 180 A. 2d 59 ([Pa.] 1962); *Weinglass v. Gibson*, . . . 155 A. 439 ([Pa.] 1931); *Osterling v. Frick*, . . . 131 A. 250 ([Pa.] 1925). In the *Osterling* case, . . . it was stated that '. . . while damages . . . cannot be based on a mere guess or speculation, yet, where the amount may be fairly estimated from the evidence, a recovery will be sustained even though such amount cannot be determined with entire accuracy.' [*Id.* at] 251. In the *Weinglass* case, . . . the court stated '. . . where there is a basis in the evidence for a reasonable computation of the damages suffered considering the nature of the transaction, a verdict may be based thereon, though there may be involved some uncertainty about it. . . .' [*Id.* at ] 440.

*Burly Constr. Corp. v. Commonwealth*, 284 A.2d 841, 844-45 (Pa. Cmwlth. 1971) (emphasis added).

10

[Appellant Municipalities] argue that we abused our discretion by shifting the burden of proof to them. Nothing could be further from the truth. . . . [W]e spent 12 full pages addressing why we determined the M&A analysis to be credible. We specifically concluded that [Appellee Municipalities] proved all of the elements of unjust enrichment, constructive trust, and the LTEA (*see* pages 46, 48 and 50 [of the trial court's opinion]). While we did factually note that [Appellant Municipalities] failed to proffer any credible alternative to the M&A analysis, we never overtly or implicitly shifted [Appellee Municipalities'] burden of proof to [Appellant Municipalities].

October 30, 2015 Op. at 2-3. The trial court's October 30, 2015 Opinion accurately described the trial court's analysis and confirms that it did not improperly shift the burden of proof. Accordingly, we reject Appellant Municipalities' argument and adopt the trial court's opinion as it pertains thereto.

Next, Appellant Municipalities assert that the trial court erred "as a matter of law and abused its discretion" by awarding pre-judgment interest at a 6% interest rate.[12] Appellant Municipalities' Br. at 34. We disagree.

[Our Superior Court] has approved [] the award of pre[-]judgment interest in particular cases:

> While the general rule is that a successful litigant is entitled to interest beginning only on the date of the verdict, it is nonetheless clear that pre-judgment interest may be awarded 'when a defendant holds money or property which belongs in good conscience to the plaintiff, and the objective of the court is to force disgorgement of his unjust enrichment.'

*Kaiser v. Old Republic Ins. Co.*, 741 A.2d 748, 755 (Pa. Super. 1999) (quoting *Dasher v. Dasher*, . . . 542 A.2d 164, 164-65 ([Pa. Super.] 1988)). Pre-judgment interest 'in such

---

[12] Notably, Appellant Municipalities' brief does not contain any legal argument supporting its contention that the trial court **erred as a matter of law** by awarding 6% interest.

cases is a part of the restitution necessary to avoid injustice.' [*Dasher*, 542 A.2d at 165].

*In re Estate of Alexander*, 758 A.2d 182, 190 (Pa. Super. 2000). Further:

> The determination of whether to award pre-judgment interest and the rate of such interest **is left to the sound discretion of the trial court in equity.** A court of equity is not limited to awarding merely the statutory rate of interest,[13] but may award interest above the statutory rate. 'The fairest way for a court [to make such determination] is to decide questions pertaining to interest according to a plain and simple consideration of justice and fair dealing.' *Murray Hill Estates, Inc. v. Bastin*, . . . 276 A.2d 542, 545 ([Pa.] 1971) (quoting *McDermott v. McDermott*, . . . 196 A. 889[, 890] ([Pa. Super.] 1938)).

*Gurenlian v. Gurenlian*, 595 A.2d 145, 148 (Pa. Super. 1991) (emphasis added; citations omitted).

"A trial court abuses its discretion when it misapplies the law, or when its decision is 'manifestly unreasonable' and not a mere error in judgment." *Prince George Ctr. v. U.S. Gypsum Co.*, 704 A.2d 141, 146 (Pa. Super. 1997). Specifically,

> '. . . an abuse of discretion exists if the trial court renders a judgment that is [plainly] unreasonable, arbitrary or capricious, fails to apply the law, or was motivated by partiality, prejudice, bias or ill will.' [*Commonwealth v. Snyder*, 977 A.2d 28, 41 (Pa. Cmwlth. 2009).] 'If the

---

[13] Section 8101 of the Judicial Code states: "Except as otherwise provided by another statute, a judgment for a specific sum of money shall bear interest at the lawful rate from the date of the verdict or award, or from the date of the judgment, if the judgment is not entered upon a verdict or award." 42 Pa.C.S. § 8101. As set forth in Section 202 of the Act of January 30, 1974, P.L. 13, *as amended*;

> Reference in any law or document enacted or executed heretofore or hereafter to 'legal rate of interest' and reference in any document to an obligation to pay a sum of money 'with interest' without specification of the applicable rate shall be construed to refer to the rate of interest of six per cent per annum.

41 P.S. § 202.

record supports the trial court's reasons and factual basis, the court did not abuse its discretion.' *Id.*

*Grine v. Cnty. of Centre*, 138 A.3d 88, 93 (Pa. Cmwlth. 2016).

In the instant matter, the trial court correctly recognized that

[s]ince 2007, [Appellee Municipalities] have been deprived of money they could have used or invested. The corollary is that [Appellant Municipalities] enjoyed the benefit of monies that they either used to earn interest/investment income or provide municipal services for which they otherwise would have had to tax their citizens.

July 15, 2015 Op. at 57. The trial court further explained that it considered different ways of calculating the pre-judgment interest, identifying three potential methods of such calculations: (1) the legal rate of interest at 6% per annum; (2) a 2.6% blended investment income average as measured by Forbes Magazine between 2005 and 2015; and, (3) "the percentage increase [in] the Standard and Poor's Fortune 500 index between January 1, 2008 [] and June 30, 2015 [] which, on average, generated a 8.9% return on investment per annum." July 15, 2015 Op. at 58. The trial court fashioned three comparison charts depicting the differences between the three approaches, and based its decision to apply a 6% interest rate on the following:

(1) The statutory rate of interest in this Commonwealth is set at 6%. [*See*] 41 P.S. § 202.

(2) While our appellate courts have not established any hard and fast rules for pre[-]judgment interest, there is at least some precedent for an award of 6% legal interest. *Pittsburgh Const*[*r*]*. Co. v. Griffith*, 834 A.2d 572 (Pa. Super. 2003); *Daset Mining Corp. v. Indus*[.] *Fuels Corp.*, 473 A.2d 584, 595 (Pa. Super. 1984). In fact, our Superior Court specifically approved a 6% rate of pre[-]judgment interest in a constructive trust context. *See* [*Gurenlian*].

(3) Investment markets have been extremely volatile since January 1, 2008. For the first several years following [Foltz' employment] termination, the stock market, the bond market and the real estate market all plummeted.

13

Since 2010, the stock and bond markets have rebounded, and have even reached unprecedented levels. Not so with the real estate market. Because of the volatility of the investment markets over the past seven and one-half years, selecting any accurate gauge of investment income would be difficult[.]

(4) If we were to select some sort of investment-driven measure of interest, powerful arguments would be available to contravene our selected measure. In our research to identify ten year investment averages, we identified numerous options. . . . Some were no doubt driven by 'puffing' designed to motivate sales and were as high as 25%. Others, like the Forbes Magazine estimate, were much lower. A few closely approximated the 6% legal rate that we have chosen. Given the lack of any generally-accepted data on investment income, we perceive that our 'safe' option is the legal rate of 6%.

July 15, 2015 Op. at 60-61.

The trial court exercised its discretion as it was permitted to do, reasonably considering various options to reach a decision on a fair interest rate given the particular circumstances before it. Nothing in the trial court's opinion demonstrates an **abuse** of that discretion, and we will not intrude on the trial court's exercise thereof absent such abuse. Accordingly, Appellant Municipalities' arguments cannot stand.[14]

Appellant Municipalities next contend that the trial court erred when it denied them recovery against the Bureau for the costs Appellant Municipalities will be required to pay back to Appellee Municipalities. We disagree.

---

[14] We note that Appellee Municipalities briefed the pre-judgment interest issue in their trial brief and requested judgment at the legal rate in their proposed and revised verdict slips. However, Appellant Municipalities did not address the interest rate issue until they filed their post-trial motion. Thus, there is no record evidence supporting Appellant Municipalities' argument that the 6% interest rate is excessive.

14

The trial court explained:

[Appellant Municipalities] are not entitled to be 'compensated' for the money that was wrongfully distributed to them by the Bureau because [Appellant Municipalities] were never entitled to possess and retain those funds in the first place. Stated differently, [Appellant Municipalities] are not entitled to be 'compensated' by the Bureau for monies that actually belonged to [Appellee Municipalities]. In fact, if we were to require that the Bureau pay [Appellant Municipalities] for the amount of the overpayments that were retained, the net result would create a windfall for [Appellant Municipalities]. Equity would not sanction such a result.

Several Pennsylvania cases have recognized that when a defendant is required to repay funds to which he had no right, title or interest, the mere fact of repayment does not 'harm' that defendant. In *Donner v. Sacket*, 97 A. 89 (Pa. 1916), the Pennsylvania Supreme Court stated that 'the [d]efendant will sustain no damage if he is compelled to repay [money mistakenly received]. In all good conscience [the plaintiffs] are entitled to it; with no good conscience can [the defendant] hold onto it, and the law requires him to return it.' *Id.* at 90. Similarly, in *Greenwich Bank v. Commercial Banking Corp.*, 85 Pa. Super. 159 [] ([]1924), a defendant was required to return a mistaken double payment. In that context, the court noted:

> Negligence in making a mistake does not deprive a party of his remedy on account thereof [for the return of a mistaken double payment]; it is the fact that one by mistake unintentionally pays money to another to which the latter is not entitled from the former, that gives the right of action. Especially so, in view [of] the fact that the [d]efendant will sustain no damage if compelled to repay the money; nor be placed in a worse condition than if the money had not been paid.

[*Id.* at 163], citations omitted.[] More recently, the Pennsylvania Superior Court declared in an insurance dispute that the requirement to repay funds mistakenly received will not be characterized as a 'loss.' In *South*

15

> *Central Employment Corp. v. Birmingham Fire Ins*[*urance*] *Co.*, 926 A.2d 977 (Pa. Super. 2007), the Court stated that 'even where inadvertently acquired, money or property that has to be returned does not belong to the [party possessing it] and therefore the [party] has not suffered a loss.' *Id*. at 982.
>
> In this case we do not believe that [Appellant Municipalities] have suffered 'harm,' 'loss' or 'damage' by being required to repay the overpaid funds that never should have been received in the first place. Because it would not be legally correct or equitably justifiable to award 'compensatory' damages to [Appellant Municipalities] for the amount of overpayments, we will reject [Appellant Municipalities'] request to recover all such overpayments from the Bureau.

July 15, 2015 Op. at 70-72.

Appellant Municipalities argue that the trial court erred in denying them compensatory damages and rely on *Brubaker v. County of Berks*, 112 A.2d 620 (Pa. 1955) for the proposition that where a third party is required to return improperly held funds, the third party may seek recovery "against an additional defendant that caused the problem." Appellant Municipalities' Br. at 43. However, *Brubaker* is distinguishable from the instant matter. There, Berks County Treasurer Moyer (Moyer) deposited monies he received from Brubaker for the purchase of a property into his account as County Treasurer.[15] When Moyer's term expired, his accounts were settled and found to be balanced, but Moyer died without having applied Brubaker's payment to the intended transaction. Brubaker sued Berks County for unjust enrichment seeking return of the monies. Berks County, in turn, sued Moyer's estate and was permitted recovery. Unlike the instant case, Moyer's acts deprived both Brubaker and Berks County of the funds. Thus, when Berks County was required to return the funds, it was likewise permitted to recover the equivalent

---

[15] "No one questions the fact of Moyer's embezzlement or breach of trust." *Brubaker*, 112 A.2d at 624 (Jones, J., concurring).

16

amount from Moyer since Moyer had subsequently deprived Berks County of those funds. In the instant action, Appellant Municipalities were not subsequently deprived of the overpayments they wrongly obtained. They are merely being required to return funds they were never entitled to receive. Accordingly, we cannot agree with Appellant Municipalities that the trial court erred when it denied them recovery against the Bureau for the costs Appellant Municipalities will be required to pay back to Appellee Municipalities, and we adopt the trial court's opinion with respect thereto.

Finally, Appellant Municipalities maintain that the trial court erroneously failed to apply equitable principles, and failed to limit Appellee Municipalities' recovery under the doctrine of unclean hands. We disagree.

The trial court began its July 15, 2015 Opinion:

Given a choice between rough but imperfect justice and gross inequity created in part by corruption, we will choose the former every time. . . .

. . . .

[Thus,] we will redistribute over three million dollars in tax revenue plus interest from municipalities that were overpaid by the corruption-ridden [Bureau] to taxpayers in municipalities who were shortchanged for a period of four years.

*Id*. at 2-3.

Appellant Municipalities allege:

The application of 'rough but imperfect justice,' frankly, confirms that . . . Appellee Municipalities did not prove their case, forcing the trial court to rely upon shoddy calculations in manufacturing an award of damages. Moreover, there was no evidence to establish that 'gross inequity' would have occurred because . . . Appellee

17

> Municipalities failed to prove with any accuracy the actual extent of any improper disbursements.

Appellant Municipalities' Br. at 45.

To the contrary, the trial court considered the M&A Report and the testimony supporting the analysis therein. It employed its own independent expert to evaluate M&A's methods in determining the amounts of over and underpayments. Although the trial court acknowledged that the M&A Report's results were not exact, the evidence demonstrated that the trial court's award was not based on "shoddy calculations," but was instead grounded on accepted forensic accounting methods. Appellant Municipalities' Br. at 45. Such evidence meets the requirements set forth in *Merrell* and *Burly Construction Corp. v. Commonwealth*, 284 A.2d 841 (Pa. Cmwlth. 1971). Finally, the trial court thoroughly explained its findings and rationale in its opinion, and we need not revisit those here. Based thereon, we conclude that the remedy fashioned by the trial court was fair, reasonable and appropriate.[16]

---

[16] Our Supreme Court has explained:

> The historic distinction between a court of law and a court of equity is the ability of the latter tribunal to fashion a remedy based upon considerations of fairness, justness, and right dealing in a particular situation as contrasted with the strictly formulated rules of common law. The chancellor in equity was expected to consider all circumstances and interests of affected parties and was given broad discretion to effectuate a remedy reflecting an equitable balancing of those considerations. Subrin, *How Equity Conquered Common Law*, 135 U.Penn L.Rev. 909, 920 (1985). In the early days of the equity courts, bills in equity could be filed to avoid forcing a dispute into 'narrow cubbyholes' and to protect a petitioner from the alleged injustice that would result from 'a rigorous application of the common law.' *Id*. at 918.

*Armstrong Sch. Dist. v. Armstrong Educ. Ass'n*, 595 A.2d 1139, 1141 n.2 (Pa. 1991).

Appellant Municipalities further assert that the trial court erred because it did not bar or limit Appellee Municipalities' recovery based on the unclean hands doctrine, given Appellee Municipalities' failure to reconcile their receipts of earned income tax revenue as statutorily required.

> A court may deprive a party of equitable relief where, to the detriment of the other party, the party applying for such relief is guilty of bad conduct relating to the matter at issue. The doctrine of unclean hands requires that one seeking equity act fairly and without fraud or deceit as to the controversy in issue.

*Terraciano v. Dep't of Transp., Bureau of Driver Licensing*, 753 A.2d 233, 237-38 (Pa. 2000) (citation omitted). "[T]he application of the doctrine to deny relief is **within the discretion of the chancellor**, and in exercising his discretion **the chancellor is free not to apply the doctrine** if a consideration of the entire record convinces him that an inequitable result will be reached by applying it." *Stauffer v. Stauffer*, 351 A.2d 236, 245 (Pa. 1976) (emphasis added).

> Here, the trial court explained:

> In this case, the Bureau could certainly have been deemed to possess 'unclean hands,' but we will not impugn [Appellee Municipalities] with any taint from the Bureau. There is absolutely no evidence in this case that [Appellee Municipalities] acted fraudulently or even knowingly with respect to the distribution of funds by the Bureau.

> We specifically reject [Appellant Municipalities'] argument that [Appellee Municipalities'] ineffective audit and reconciliation process should be equated with fraud, deceit or bad faith. In this regard, we clearly recall the testimony of [accountant, Cheri] Freeh [(Freeh)], who was the expert witness most familiar with auditing and reconciliation of tax collection agencies.[17] Freeh testified that while local

---

[17] Freeh was a witness for Appellant Municipalities. She is a principal in an accounting firm, but admitted that she is not qualified to conduct a financial reconstruction such as the one at issue in this matter. The trial court found that Freeh "has a wealth of experience in auditing of tax

municipalities are required to conduct periodic reconciliations of tax receipt records, 'in reality, most school districts and municipalities rely upon the reconciliation of the taxing agency and its auditor.' They do this because it would be impossible for political subdivisions to conduct a proper reconciliation because the tax collector – not the local agencies - possessed the actual records.

On multiple occasions and in several contexts, Freeh emphasized that the type of audit reconciliation completed by governmental entities is typically far less strenuous than the audits that are required of the tax collection agency. In fact, Freeh even testified that while the Bureau's auditor should have discovered problems at the Bureau, she would not have expected a governmental agency audit to have detected what was going wrong at the Bureau.

We must also recognize that, to the extent [Appellant Municipalities] argue that greater oversight should have been undertaken by [Appellee Municipalities], they must look in a mirror at their own conduct. It is certainly arguable that every single Lebanon County political subdivision should have more actively participated in oversight of the Bureau. This includes [Appellee Municipalities]; it also includes [Appellant Municipalities]. For us to hold today that [Appellee Municipalities] are guilty of 'unclean hands' for improper oversight of the Bureau would be to punish [Appellee Municipalities] for conduct that was identical to that of [Appellant Municipalities]. Equity would not sanction such a result.

July 15, 2015 Op. at 54-55.

It is clear that the trial court, in its discretion, carefully considered the doctrine of unclean hands and the various parties' roles in the events leading to the instant litigation. Based on the record evidence, the trial court acted well within its authority when it declined to apply the doctrine. Thus, Appellant Municipalities' argument fails.

collection agencies such as [the] Bureau[, and] has unique experience with respect to local government taxation." July 15, 2015 Op. at 21.

20

For all of the above reasons, the judgments are affirmed.


_____
ANNE E. COVEY, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

City of Lebanon, Jonestown Borough, :
North Cornwall Township, North :
Lebanon Township, North Londonderry :
Township, Northern Lebanon School :
District, Palmyra Area School District, :
South Lebanon Township, South :
Londonderry Township, Swatara :
Township, Union Township, and West :
Lebanon Township :
                  :
          v. :
                  :
Cornwall Borough, Heidelberg :
Township, North Annville Township, :
West Cornwall Township, and :
Bethel Township, :
                  :
          v. :
                  :
Lebanon County Earned Income Tax :
Bureau :
                  :
Appeal of: Cornwall Borough, :
Heidelberg Township, West Cornwall :   No. 2419 C.D. 2015
Township, and Bethel Township Board :

## O R D E R

AND NOW, this 6th day of October, 2016, the Lebanon County Common Pleas Court's November 9, 2015 and November 19, 2015 judgments are affirmed.

_____
ANNE E. COVEY, Judge